209 F.2d 250
 MASSY
v.
KENDALL.
 No. 603.
 United States Emergency Court of Appeals.
 Heard at St. Paul, Minn. November 23, 1953.
 Decided January 11, 1954.
 
 Thomas Vennum, Minneapolis, Minn., Vennum, Newhall & Ackman, Minneapolis, Minn., on the brief, for complainant.
 Katherine Hardwick Johnson, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section, and James A. Durham, Stabilization Counsel, and Joseph T. Maioriello, Washington, D. C., and Horace H. Robbins, Special Counsel, Office of Defense Mobilization, New York City, on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MARIS, Chief Judge.
 
 
 1
 The complainant in this case seeks a determination of the validity of Section 3 of Supplementary Regulation 5[1] to the General Ceiling Price Regulation,[2] insofar as it established retail prices for extra, special or optional equipment attached to new automobiles. The complainant, James F. Massy, who is engaged in the retail sale of Ford automobiles under the trade name of Massy Motors in Little Falls, Minnesota, was adjudged to have violated SR 5 in an action brought by the United States under Section 409(c) of the Defense Production Act of 1950[3] in the United States District Court for the District of Minnesota to recover treble the amount of alleged overcharges on the sale of 34 new 1951 Ford automobiles amounting to $1,116.95. The complainant conceded overcharges in the amount of $258.33. The difference of $858.62 between the Government's claim and the complainant's admitted overcharges involved the excess of the prices charged by the complainant over those suggested by the Ford Motor Company in its price list for extra equipment, namely, Fordomatic transmissions, overdrives, radios, heaters and directional turn indicators, one or more of which were factory-installed in each of the 34 new Fords there involved. The district court directed a verdict against the complainant for single damages only in the amount of $1,116.95 and entered judgment thereon on May 13, 1952. By leave of the district court, given pursuant to Section 408(e) (1) of the Act,[4] the present complaint was filed in this court.
 
 
 2
 On August 13, 1952, we granted complainant leave to introduce evidence in support of his complaint. Pursuant to Section 408 of the Act the evidence was ordered submitted to the Director of Price Stabilization who was directed to receive it and to certify and file in this court a transcript of it and of such other evidence and such statement or opinion as he should think proper to include therein. On September 25, 1953 the transcript was filed in this court.[5] The case was heard on November 23, 1953 and it is now before us for consideration.
 
 
 3
 On January 26, 1951, the GCPR was issued to freeze retail prices at the highest level charged during the base period, December 19, 1950 to January 25, 1951. SR 5 to the GCPR was issued effective March 2, 1951. It was designed temporarily to establish a uniform pattern of ceiling prices for new and used automobiles until a permanent regulation could be prepared with the advice of representatives of the industry. In Norman-Frank, Inc. v. Arnall, 1952, 196 F.2d 502, this court had occasion to consider the manner in which SR 5 was adopted. We found the procedural attacks there made upon the regulation to be without merit. That case involved Section 4 of the regulation relating to the ceiling prices for used automobiles. We are concerned in the present case, however, only with Section 3 of the regulation, which established the technique for determining ceiling prices for new automobiles. A new automobile was defined in Section 2 of the regulation as any automobile, including its standard equipment, for which the manufacturer published a suggested price for sale at retail. The manufacturers' suggested list prices for sale at retail in effect prior to January 26, 1951 were established as ceiling prices for the retail sale of new automobiles. The ceiling delivered price for a new automobile was to be the sum of the manufacturer's suggested list price for the automobile and for any extra, special or optional equipment, plus charges enumerated in Section 3 of the regulation for transportation, taxes, preparing and conditioning, and for any special services requested by the customer.
 
 
 4
 In a general letter, dated January 23, 1951, addressed to all dealers in the Twin City District, in which Little Falls lies, the Ford Motor Company suggested retail prices for the various types of 1951 Ford passenger cars, which, under Section 3(a) of the regulation, became components of the ceiling delivered price. Listed also were the Ford Motor Company's charges for distribution and delivery (including federal excise tax) of the various models of Ford passenger cars, a suggested charge of $15 for preparation and conditioning, and the total sum of these figures. Following this were listed suggested retail prices for "Optional Equipment (Factory Installed)" and "Accessories (Factory Installed)."
 
 
 5
 A new automobile, on delivery to the dealer, requires certain adjustments before it is in condition for delivery to the customer. The complainant charged for this preparation and conditioning only $15, the amount suggested by the Ford Motor Company and its ceiling price under Section 3(f) of the regulation, although there is evidence that the average charge for this work in the Minneapolis region was $46.17 while dealers in some other parts of the country charged as much as $150. When it came to extra equipment and accessories installed on an automobile at the factory, however, the complainant charged more than the retail prices suggested by the Ford Motor Company. Thus in the case of the five items involved in its adjudged overcharges the excess was as follows:
 
 
 6
 Equipment or Complainant's Ford suggested Excess
 accessory price retail price

 Fordomatic transmission $168.50 $159.30 $ 9.20
 Overdrive 97.00 92.00 5.00
 Six tube radio 78.00 74.00 4.00
 Heater 65.00 54.50 10.50
 Directional turn indicator 21.25 12.50 8.75
 
 
 7
 The complainant seeks to justify these excess charges on the basis of the fact that these items of optional equipment and accessories even though installed in the car at the factory required some additional preparation and installation work on the part of the dealer. He says that most dealers absorb the cost of this work in their larger charge for preparation and conditioning of the car itself. He, however, is one of a group of dealers who charge the smaller amount of $15 for preparing and conditioning a car and who accordingly follow the practice of charging for the necessary work on extra equipment and accessories by making a somewhat larger charge for those items than the Ford Motor Company suggested. To the extent that Section 3 of SR 5 has been construed to prohibit him from continuing to do this he urges that it is invalid.
 
 
 8
 Before we undertake to consider the complainant's attack upon the regulation we must notice a question of interpretation which is in dispute between the parties. The question arises in connection with paragraphs (a) and (b) of Section 3 of SR 5, which, with paragraph (f), as originally issued read as follows:
 
 
 9
 "Sec. 3. Ceiling prices for new automobiles. The ceiling delivered price for a new automobile for sale at retail shall be the sum of the following items:
 
 
 10
 "(a) The manufacturer's suggested list price in effect prior to January 26, 1951. If the car is a new model for which the manufacturer had not published a list price prior to January 26, 1951, the suggested list price which the manufacturer first publishes after January 26, 1951 may be used.[6]
 
 
 11
 "(b) A charge for any extra, special or optional equipment requested by the customer in writing and attached to the automobile (this charge shall not exceed the manufacturer's suggested list price for the equipment or the suggested list price of the producer of the equipment, as the case may be, in effect on January 26, 1951, but may include the ceiling price established under the General Ceiling Price Regulation for installation of the equipment, if a charge for installation was customarily made during the period December 19, 1950 to January 25, 1951, inclusive).[7]
 
 
 12
 * * * * *
 
 
 13
 "(f) The ceiling price established under the General Ceiling Price Regulation for preparing and conditioning the new automobile for delivery."
 
 
 14
 It is the contention of the Government, which the district court adopted in directing a verdict against the plaintiff, that the ceiling price of special, extra or optional equipment installed at the factory is fixed by paragraph (a) of Section 3, being comprehended within the phrase "manufacturer's suggested list price," and that the reference in paragraph (b) to "any extra, special or optional equipment requested by the customer in writing and attached to the automobile" refers only to such equipment when installed wholly by the dealer. The Government asserts that the charge allowed under paragraph (f) for preparing and conditioning includes such work done with respect to factory installed optional equipment. The complainant contends, on the other hand, that the language just quoted from paragraph (b) comprehends all extra, special or optional equipment regardless of by whom installed and that the language of paragraph (a) refers only to the manufacturers' suggested price for the automobile itself and its standard equipment. On the basis of this contention the complainant asserts that the parenthetical clause of paragraph (b) authorized the continuance of any customary installation charge by the dealer for the preparing and conditioning of optional equipment even though it was originally installed at the factory. Finally he says that the excess of his customary charges for optional equipment over the suggested Ford prices represent such an installation charge and were, therefore, lawful under Section 3(b).
 
 
 15
 We, of course, do not enter into this question of interpretation in this case which has been brought under Section 408(e) of the Act since in such a case we are bound, in order to assure the complainant the relief to which he may be entitled, to accept the interpretation placed upon the regulation by the district court.[8] The case is complicated in this respect, however, by the fact that the complainant has taken an appeal to the Court of Appeals for the Eighth Circuit from the judgment entered against him in the district court and on that appeal he is urging, inter alia, that the interpretation of the regulation made by the district court is erroneous and that the judgment should, therefore, be reversed. It may well transpire that the Court of Appeals will take a different view of the meaning of paragraphs (a) and (b) of Section 3 of the regulation from that which has been taken by the district court so that the final judgment ultimately entered by the district court after the coming down of the mandate of the Court of Appeals may present quite a different question of validity from that which is now presented to us. In this posture of the case it would seem unwise for us now to pass upon the validity of Section 3(a) construed, as the district court has done, to apply to factory-installed extra, special or optional equipment and to deny the complainant his customary prices for such equipment. For that question may well become moot if the district court's present interpretation meets with disapproval on appeal. Accordingly, for us to consider the question now, before the pending appeal is determined, would be to depart from the settled and salutary rule than an appellate court will not consider the validity of a statute or of a regulation having statutory force unless it is necessary to do so in order to determine the rights of the parties,[9] and especially not until the final determination of the district court has been made and necessarily presents the question.[10] In the unique procedure in which this court is considering the present case that final determination necessarily involves the process of appellate review.
 
 
 16
 We do not suggest, however, that the complainant should have delayed making application for leave to file his present complaint until after his appeal had been decided. On the contrary Section 408(d) [then Section 408(e)] of the Act would appear to have required him to make his application when he did. Certainly that was in any event the safer course for him to pursue. Section 408(d) is silent as to the course to be pursued by this court in the present circumstances. We think, therefore, that in the exercise of a sound discretion we should defer consideration of the merits of the complaint until after the Court of Appeals has disposed of the pending appeal and we are advised as to the interpretation of the regulation which that court directs the district court to follow and apply in the judgment ultimately entered in the case.
 
 
 17
 An order will be entered postponing further consideration of this case until after the filing in the clerk's office of a certified copy of the opinion of the Court of Appeals for the Eighth Circuit disposing of the appeal now pending from the judgment entered against the complainant in the District Court for the District of Minnesota and of any judgment entered by the district court pursuant to the opinion and mandate of the Court of Appeals.
 
 
 
 Notes:
 
 
 [1]
 16 FR 1769, effective from March 2, 1951 to October 15, 1951 when it was superseded by Ceiling Price Regulation 83, 16 FR 10594
 
 
 [2]
 16 FR 808, effective January 26, 1951
 
 
 [3]
 50 U.S.C.A.Appendix, § 2109(c)
 
 
 [4]
 Shortly thereafter by the Defense Production Act Amendments of 1952 this subsection was renumbered Section 408 (d) (1). 50 U.S.C.A.Appendix, § 2108 (d) (1)
 
 
 [5]
 By General Order 20, June 30, 1953, 18 FR 3949, the functions of the Director of Price Stablization were delegated to the Assistant Administrator of the Economic Stablization Agency who filed an opinion in this matter and certified the transcript
 
 
 [6]
 Subparagraph (a) was amended by Amendment 3, effective May 22, 1951, 16 FR 4652, and Amendment 4, effective June 30, 1951, 16 FR 6028
 
 
 [7]
 Subparagraph (b) was amended by Amendment 6, effective September 14, 1951, 16 FR 9472
 
 
 [8]
 Collins v. Bowles, Em.App.1946, 152 F. 2d 760, 762; Conklin Pen Co. v. Bowles, Em.App.1946, 152 F.2d 764, 766; Gordon v. Bowles, Em.App.1946, 153 F.2d 614, 615, certiorari denied 328 U.S. 858, 66 S.Ct. 1350, 90 L.Ed. 1629; Van Der Loo v. Porter, Em.App., 1946, 160 F.2d 110, 112
 
 
 [9]
 Liverpool, N. Y. & P. Steamship Co. v. Emigration Commissioners, 1885, 113 U. S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899; Baker v. Grice, 1898, 169 U.S. 284, 292, 18 S.Ct. 323, 42 L.Ed. 748; Arkansas Louisiana Gas Co. v. Department of Public Utilities, 1938, 304 U.S. 61, 64, 58 S. Ct. 770, 82 L.Ed. 1149; Alabama State Federation of Labor v. McAdory, 1945, 325 U.S. 450, 461-462, 65 S.Ct. 1384, 89 L.Ed. 1725
 
 
 [10]
 Wilshire Oil Co. v. U. S., 1935, 295 U. S. 100, 102-103, 55 S.Ct. 673, 79 L.Ed. 1329. Cf. Spector Motor Co. v. McLaughlin, 1944, 323 U.S. 101, 105, 65 S. Ct. 152, 89 L.Ed. 101