219 F.2d 710
 TANNERS HIDES Inc. OF TEXAS
v.
Charles H. KENDALL, Assistant Director, Office of Defense Mobilization.
 No. 661.
 United States Emergency Court of Appeals,
 Heard at San Antonio, Texas, November 22, 1954.
 Filed March 4, 1955.
 
 Herman A. Greenberg, Washington, D. C., for the complainant.
 Stephen W. Terry, Jr., Attorney, Department of Justice, Washington, D. C., with whom Warren E. Burger, Asst. Atty. Gen., and Edward H. Hickey, Chief, General Litigation Section, Department of Justice, and James A. Durham, Special Counsel, Office of Defense Mobilization, Washington, D. C., were on the brief for the respondent.
 Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.
 LINDLEY, Judge.
 
 
 1
 This complaint, filed pursuant to Section 408(d) of the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix, § 2108(d), challenges the validity of Ceiling Price Regulation 2, Revision 1, effective March 19, 1951, 16 F.R. 2492.
 
 
 2
 Complainant, a corporation organized under the laws of Texas, is a dealer in bovine hides. As such, it buys from producers and resells to tanners, usually in carload lots. In this respect, however, the sales here involved were unique. Thus, during the period of price controls and for some years prior thereto, complainant had one customer, Tex Tan, who regularly purchased in less-than-carload quantities. This company, a manufacturer of leather goods, in order to insure the quality of leather it desired, tanned its own hides, and, in operating its business, was able to use only less-than-carload shipments of hides, i. e., smaller quantities than are desirable or customary in the tanning industry generally.
 
 
 3
 Between May 15 and October 12, 1951, complainant made six such shipments to Tex Tan, for which it charged the "standard packer selection" prices established by the regulation. On May 2, 1952, the Government filed an enforcement suit, based on the averment that these sales were made for more than the lawful maximum price, in that the prices charged exceeded the general ceiling price established for such commodities. This was denied by complainant, who claimed that it was entitled to charge standard packer selection maximum prices.
 
 
 4
 Section 2 of C.P.R. 2, Rev. 1, "Cattlehides, Kips and Calfskins," fixed two scales of prices. Thus, Table I fixed the general ceiling prices for ungraded hides while Table II fixed a substantially higher price for hides sorted on the basis of standard packer selection grades. A selected hide, within the meaning of the regulation, is one which has been cured, identified, graded and segregated by the seller, prior to shipment, in accord with accepted standards prevailing in the industry. The first sentence of the headnote to Table II provided, however, that the prices fixed could be charged only for deliveries of selected hides in carload lots, i. e., "36,000 pounds or more", for cattlehides, while note 4 required a 2 cent per pound reduction in price of bullhides shipped in less-than-carload lots.
 
 
 5
 On November 19, 1952, complainant, having obtained a continuance of the enforcement action, filed a protest against Section 2 of the regulation on the ground that conditioning of the right to demand "selected" prices upon shipment of carload quantities of hides rendered the regulation invalid. This protest was denied on December 4, 1952, on the ground that it had been filed too late.
 
 
 6
 The District Court having entered judgment for the plaintiff in the enforcement action, complainant, on September 29, 1953, filed an application for a stay and for leave to file a complaint in this court challenging the validity of the regulation. The Application was granted and this complaint followed. On February 9, 1954, we denied without prejudice respondent's motion to dismiss on jurisdictional grounds, which motion is now renewed.
 
 
 7
 Respondent's chief argument, in this respect, is that the application and the leave granted do not include the objections to the regulation which complainant now seeks to raise. The application incorporated, by reference, the untimely protest which detailed specific objections to the headnote of Table II and Note 4. Although the order granting leave to file does not expressly set forth all these objections, it nevertheless incorporates the necessary jurisdictional findings under the provision of Section 408(d) and we must, we believe, construe the order as a grant of leave to raise objections coextensive with those submitted to respondent in the protest and incorporated by reference in the application. We certainly cannot consider the order in a vacuum, divorced from and without relation to the application upon which it was entered. Under any reasonable interpretation we think that the findings of the enforcement court are in substantial accord with jurisdictional requirements. Limiting the complaint, as we must, to the specific objections raised by complainant in its application for leave to file, the issues growing out of its objections to the first sentence of the headnote of Table II and to Note 4 are properly before us for decision and respondent's motion must be denied.
 
 
 8
 Complainant attempts, however, to raise objections to certain provisions of Table I. These objections are clearly beyond the scope of the issues preserved by its application to the enforcement court and the order granting leave to file and, therefore, are not properly before us. Accordingly, we do not consider them. Taub v. Bowles, Em.App., 149 F. 2d 817; Fournace v. Bowles, Em.App., 148 F.2d 97.
 
 
 9
 Before we reach the question of validity of the regulation, we shall consider respondent's contention that there is no evidence before us that the particular shipments of hides in question were of standard packer selections but that, on the contrary, they were heterogeneous lots, the price of which is governed by Table I prices for unselected hides, and that complainant has not sustained its burden to prove that the transactions are within the provisions of the Table II scale for selected hides.
 
 
 10
 We digress for a moment to bring the question into proper perspective. The factual question now presented grew from a well-masked supposed denial at the pleading stage of the proceeding, to a small voice during the briefing stage and ultimately to a crescendo, at the time of oral argument. For example, ignoring for the moment the pleading aspects, this question, to which respondent's oral argument was principally directed, is mentioned in his brief in only one sentence, which is to the effect that, by paragraph 5 of his answer, respondent had denied that the hides in question were of standard packer selections.
 
 
 11
 When the unique relationship of the proceeding in this court to that in the enforcement court is considered, we are of the opinion this question was not put in issue by the pleadings. A suit in this court on a Section 408(d) complaint is ancillary to the enforcement proceeding out of which it grows. Massy v. Kendall, Em.App., 209 F.2d 250; Conklin Pen Co. v. Bowles, Em.App., 152 F.2d 764, 766. We are concerned solely with the issue whether the regulation is valid as applied by the enforcement court to the specific operation of the particular complainant in question. Therefore, in deciding the question of validity, we accept the interpretation placed upon the regulation by that court, Massy v. Kendall, supra; Van Der Loo v. Porter, Em. App., 160 F.2d 110; Conklin Pen Co. v. Bowles, supra; Collins v. Bowles, Em. App., 152 F.2d 760; Gordon v. Bowles, Em.App., 153 F.2d 614, 615, certiorari denied 328 U.S. 858, 66 S.Ct. 1350, 90 L. Ed. 1629. In the case at bar, the crucial question, then, is whether the enforcement court found that the hides involved satisfied the qualitative standards of selection requisite to a demand of Table II prices, whether sold in carload or less-than-carload lots.
 
 
 12
 Two averments of the complaint sufficiently charge that the hides in question were graded according to standard packer selections. Throughout the files the word "selected" and the term "standard packer selection", with reference to hides, are used interchangeably. Paragraph 6 alleges that primarily complainant sells hides "on a selected basis to tanners in carload lots" and that "the sales involved in the suit in the District Court were unique in the complainant's operations in that they represented sales of `selected' hides in less than carload lots to one customer, a manufacturer of fine quality leather goods * * *". Respondent admits the first averment with some equivocation, i. e., that complainant customarily sold hides to tanners in carload lots, omitting any reference to quality or selection. The second averment quoted is admitted unequivocally. Of greater pertinence, perhaps, is the allegation in paragraph 5 as follows: "There was no dispute at the trial before the District Court, that, but for the quantity requirements, the complainant would have been entitled, because of the type of hides sold and other pertinent consideration, to the prices it had charged and which had been determined by reference to Table II. The District Court in interpreting and applying the regulation, held that, because such minimum weight requirements had not been satisfied, the Table II prices were not available to complainant, and that therefore its ceiling prices in connection with the sales in question were to be determined by reference to the substantially lower Table I prices. Overcharges were computed and judgment was entered accordingly." (Emphasis supplied.) This then is the key factual averment of the complaint, viz., the manner in which the regulation in question was applied by the enforcement court to complainant's sales to Tex Tan. The Tables referred to are clear. Table I fixes prices for heterogeneous lots of hides; Table II those for the well defined standard packer selections. Thus, complainant's allegation imports a determination by the District Court that the hides in question met the qualitative standards for "selected" prices, but not the quantitative restrictions of the regulation.
 
 
 13
 Responsive to this averment, respondent admitted "that the District Court held that Ceiling Price Regulation 2 as revised was clear with respect to complainant's violations, with respect to the relationship of quantities to ceiling prices, and in its application to other than sales between dealers." Obviously this is neither admission nor denial of the specific allegations quoted. By this pleading complainant was not, and we are not, given the benefit of anything even so substantial as a negative pregnant upon which to frame the crucial issue. We are advised by complainant as to what the court found and if an issue of fact was to be drawn on this phase of the case it was incumbent on defendant, not only to deny the allegation, but also to aver the true nature of the trial court's findings. Nor are respondent's general denials, when read in conjunction with certain necessarily implied admissions, sufficient to raise any factual issue as to the grades of the hides involved.
 
 
 14
 As to validity, the complaint alleges that the "less-than-carload lots" provisions of the regulation are invalid as applied to the transactions in question in that they (1) are arbitrary and capricious, (2) are unjust and inequitable, (3) require changes in business practices in contravention of Section 402 (g) of the Act, 50 U.S.C.A.Appendix, § 2102 (g), and (4) do not effectuate the purposes of the Act, in that they tend to disrupt the normal operation and functioning of relatively small, independent businesses dealing with the hide industry by depriving them of their source of supply.
 
 
 15
 By our order entered on March 15, 1954, we referred the case to respondent for the purpose of taking and reporting the evidence bearing on these questions, pursuant to which respondent received and incorporated in the record evidence offered by complainant, and his countervailing evidence, and certified it to the court, together with his finding based thereon, inter alia, that if any change in practice is required by the regulation, it is a change in "pricing practices" not business practices, which does not afford a ground for invalidating a price control regulation, George V. Tribe Co. v. Kendall, Em.App., 210 F.2d 658, and cases cited therein; that the challenged provisions are necessary to prevent evasion and circumvention, and that complainant's other objections are without merit.
 
 
 16
 These findings are effective only to point up the contentions now advanced by respondent. Although our order directed respondent to receive the evidence and report it to the court together with any statement or opinion "with respect thereto" which he might see fit to formulate, such opinion and the findings entered have no binding effect on our decision, but, on the contrary, are merely advisory. Lee v. Fleming, Em. App., 158 F.2d 984, certiorari denied 331 U.S. 805, 67 S.Ct. 1186, 91 L.Ed. 1826. We need not repeat what was well said in that opinion by Judge Maris, except to reiterate that the respondent appears before us in a 408(d) proceeding as a party, not as an administrator whose prior determination is before us for review. That he was chosen by the court pursuant to the statute and our rules as our depository agency does not render his opinion thereon any more weighty than the contentions and arguments which any litigant may advance before this or any other court of original jurisdiction.
 
 
 17
 Complainant submitted affidavits of six members of the industry tending to support its allegations that the regulation required changes in business practices, especially among small dealers, and respondent submitted the affidavits of five experts to the effect that customarily less-than-carload lots of hides sold for a lesser price than larger shipments. On the basis of this evidence, we find the relevant facts as follows.
 
 
 18
 Bovine hides are a by-product of slaughter of cattle. Large operators generally cure their own hides (a salting process), and sell directly to tanners. However, such a course is not always feasible in small plants, which vary from the slaughter of animals for home consumption by farmers and ranchers to that of small commercial packing plants. Dealers collect, grade, and frequently cure, the small lots of hides thus produced, for sale in larger lots to tanners. They vary from small operators who buy unselected hides, usually in very small lots, for resale on an unselected basis, to those whose sole or principal business is collecting and grading small lots of unselected hides preparatory to sale on a selected basis to tanners. Brokers act as intermediaries between large slaughterers and dealers and the tanning industry, which is the ultimate market for most hides. The tanners in turn process the hides to produce leather which is sold to consumers, i. e., manufacturers of leather goods. While, at all times pertinent to this case, the greater part of the product of the industry went into the channels of distribution outlined above, a relatively small part thereof was sold, frequently in rather small quantities, to tanner-manufacturers whose tanning operations are only incidental to their principal business of manufacturing leather goods. It is not disputed that Tex Tan is within the last mentioned category; that, for a long period of time prior to the effective date of the regulation, a small part of complainant's business was composed of sales to Tex Tan, and that each of such transactions involved relatively small quantities of various grades and types of hides.
 
 
 19
 Sales practices in the industry fall into a rather clear pattern. Frequently less-than-carload lots of ungraded hides have commanded a lesser price than larger lots; as a result dealers are able profitably to accumulate and grade small lots for resale to tanners. Sales of selected hides to the tanning industry generally, i. e., those whose sole business is the production of leather to supply the demands of manufacturers, are usually made in carload or larger lots. The higher unit costs inherent in transporting and handling small shipments make less-than-carload lots of hides unattractive to such tanners to such an extent that customarily such small lots have commanded lesser prices than larger shipments. This custom has not extended, however, to less-than-carload transactions between dealers and the relatively small select tanner-manufacturer. The evidence indicates that the latter trade, which admittedly is a very small part of the entire industry, does not appeal to most dealers. But as to those who were willing to supply the demands of such customers, usually such sales not only have not been made at a price less than that which carload lots would bring, but frequently have been at a premium.
 
 
 20
 Thus, upon careful analysis, it appears that the evidence is practically free from conflict. All of the experts upon whose testimony respondent relies are brokers or others in the field, who deal solely with large lots of hides for the tanning industry generally, or for large manufacturers of shoes and like articles of leather goods, who produce their own leather and demand enormous quantities of cured hides. These experts treat the sale of small lots to relatively small consumers of leather, who operate tanneries for the sole purpose of producing leather for their own use, as atypical in the industry. Complainant's affiants recognize the fact that such small lot sales are a minor part of a dealer's business, but state that demands for only less-than-carload lots are known to the industry and customarily have been met by dealers. Thus, if there is conflicting evidence, it is in the nature of a conflict of evaluation placed on the various factual aspects of the trade by the upper echelon of the industry as contrasted to that by the smaller factors who operate on a much less pretentious scale. In other words, in the battle of affidavits the opposing forces face opposite directions on separate arenas which are separated in a mercenary sense by a wide terrain.
 
 
 21
 We do not believe, however, that we need base our decision on Section 402 (g) of the Act. Whether or not these fringe area sales attain the stature of an industrywide business practice, they were a part of the industry prior to imposition of price controls. We conclude that the portions of Table II to which objection is made are invalid as applied to complainant's questioned transactions because the price differential standard which tends to discourage this portion of the trade is arbitrary, capricious and inequitable as applied to complainant's transactions involved here and does not effectuate the purposes of the Act.
 
 
 22
 In the statement of considerations accompanying C.P.R. 2, Rev. 1, respondent stated: "The prices of hides sold in [less-than-carload lots] are lower than those sold in larger lots. This tends to encourage the purchase of small lots by dealers, who collect and sort them into various weight and grade selections." There is no other finding as to the price differential. Clearly the reference is to transactions in ungraded hides, a phase of the operation of the industry which, of necessity, is completed before a dealer has selected hides for sale. The reason stated does not support the application of a like price differential to sales by dealers to tanners and the provisions in question have no reasonable relationship to the purposes of the regulation. The differential as applied to complainant's operations is arbitrary, capricious, and inequitable in contravention of the provisions of Section 402(c) of the Act, 50 U.S.C.A.Appendix, § 2102(c).
 
 
 23
 Respondent contends, however, that the challenged provisions were necessary to prevent evasion and circumvention. Thus, the statement of considerations contains a finding that, insofar as C.P.R. 2, Rev. 1, might require changes in business practices, such changes were necessary to prevent evasion. Prevention of evasion is mainly an enforcement problem and "a regulation expressly found by the Administrator to be necessary to prevent circumvention is not valid if it is not fair and equitable or if it is arbitrary or capricious." Supak v. Porter, Em.App., 158 F.2d 803, 806. To the same effect are our decisions in Booth Fisheries Corp. v. Bowles, Em.App., 153 F.2d 449, and Bayuk Cigars v. Porter, Em.App., 154 F.2d 503. No reason appears why the regulation could not have been drafted in such a way as to remove the evil of circumvention without the adoption of an arbitrary price differential. See Booth Fisheries Corp. v. Bowles, supra, 153 F.2d at page 452.
 
 
 24
 A second reason reinforces the conclusion that the regulation must be stricken, namely, that the price differential provisions of Table II do not effectuate the purposes of the Act. Section 401 of the Act provides that one purpose is the "furtherance of the American system of competitive enterprise, including independent small-business enterprises" — i. e., to give the underdog an equal opportunity, in competition with larger businesses, to purchase commodities in a tight market.
 
 
 25
 Complainant might have supplied the demand of Tex Tan for selected hides at a substantially lower price than the maximum for such hides or it might have refused to supply its customers' demands, held its hides and demanded the maximum price from buyers who could use carload quantities. The price differential gave it no other alternative. Common experience belies the validity of respondent's argument that the regulation does not prohibit such transactions; that the source of supply to the small tanner-manufacturer is not affected, but that the regulation merely reduces the dealers' margin of profit on such sales. The practical effect of the regulation is to choke off the supply of hides to such small enterprises and to direct processing of the commodity through the large tanneries having facilities to process vast accumulations of hides. In this respect the provisions of the regulation are somewhat analogous to those stricken down in Reichel-Korfmann Co. v. Porter, Em.App., 155 F.2d 730, where we held that a regulation which tended to channel distribution through one type of dealer rather than another did not effectuate the purposes of the Act and is invalid.
 
 
 26
 The first sentence of the headnote, "You may not use this Table for fully cured hides unless you deliver from the point of shipment in lots of 36,000 pounds or more," and Note 4 to Table II of C.P.R. 2, Rev. 1, are violative of Sections 401 and 402(c) of the Act in the respects above noted and are invalid.
 
 
 27
 Judgment will be entered declaring the provisions of Table II of Ceiling Price Regulation 2 Revision 1 referred to above, invalid as applied to complainant's sales to Tex Tan.