244 F.2d 723
 PUROFIED DOWN PRODUCTS CORPORATION
v.
Charles H. KENDALL, Assistant Director, Office of Defense Mobilization.
 No. 650.
 United States Emergency Court of Appeals.
 Heard at Washington, D. C., May 23, 1956.
 Reargued at Washington, D. C., March 13, 1957.
 Decided May 9, 1957.
 
 Nicholas J. Chase, Washington, D. C., with whom Harry M. Rubin, Jr., and A. Kenneth Pye, Washington, D. C., were on the brief, for complainant.
 Katherine Hardwick Johnson, Atty., Dept. of Justice, Washington, D. C., for respondent.
 Before MARIS, Chief Judge, and MAGRUDER, McALLISTER, LINDLEY and LAWS, Judges.
 MARIS, Chief Judge.
 
 
 1
 This case concerns the validity of Ceiling Price Regulation 87, issued October 19, 1951,[1] and Amendment 1 thereto, issued April 15, 1952,[2] imposing ceiling prices on processed landfowl and waterfowl feathers. Waterfowl feathers are essential to the manufacture of sleeping bags, flight gear and certain other military equipment because of their unique insulating and filling properties. About 85% of the annual requirements of this commodity are imported from foreign sources, principally China, Poland, Hungary and Czechoslovakia. Due to their essential military use waterfowl feathers were included in the national stock pile procurement program administered by the General Services Administration.[3] On April 16, 1951 the National Production Authority issued Order M-56[4] which restricted the sale of all waterfowl feathers to military and defense purposes.
 
 
 2
 The General Ceiling Price Regulation, which had been issued on January 26, 1951,[5] froze the prices of domestic goods generally. Ceiling Price Regulation 31,[6] issued May 4, 1951, permitted importers generally to adjust the ceiling prices of the imported commodities which they sold to reflect added costs attributable to price increases made by foreign suppliers. Thus, sales of imported raw and processed feathers were subject to flexible ceiling prices dependent upon foreign costs while sales of domestically produced raw and processed feathers were subject to the fixed frozen ceilings of the General Ceiling Price Regulation. About this time the Feather and Down Advisory Committee formed by the Director of Price Stabilization had called upon him to establish fixed dollars-and-cents ceiling prices on all sales of processed feathers. The Munitions Board advised the Office of Price Stabilization that prices of imported waterfowl feathers had risen rapidly despite concerted efforts to resist such a rise and that it considered a dollars-and-cents ceiling on processed feathers essential. On October 19, 1951 the OPS exempted all sales of raw and unprocessed landfowl and waterfowl feathers from price control.[7] On the same day, it issued CPR 87[8] which established fixed dollars-and-cents ceiling prices on sales of processed feathers. By section 5(d)[9] of the regulation, however, it was provided, in substance, that pre-existing GSA contracts could be performed according to their prices and terms to the extent that on October 19, 1951, the effective date of the regulation, the person holding such a contract either had physical possession of the feathers with which to fill it or was subject to a written firm raw feather purchase commitment legally binding on him. Effective April 16, 1952, Amendment 1[10] to CPR 87 was issued amending section 5(d) so as to provide that irrespective of any contractual relationship theretofore established no more deliveries of waterfowl feathers could be made to GSA at prices higher than the applicable dollars-and-cents ceilings established by CPR 87 unless the feathers had been processed and inspected by GSA and the processor had been notified in writing on or before April 16, 1952 that the goods were acceptable. Almost a month later, on May 12, 1952, the National Production Authority revoked Order M-56[11] thereby releasing feathers from governmental pre-emption and restoring them to sale for civilian use. Control of the prices of processed waterfowl feathers was terminated on March 12, 1953.[12]
 
 
 3
 Shortly after Order M-56 had terminated the sale of waterfowl feathers for civilian use, the complainant, Purofied Down Products Corporation, an importer and processor of waterfowl feathers, negotiated for the sale of such feathers and down to GSA for the national stock pile. Eight contracts were entered into prior to October 19, 1951, the first on May 1, 1951 and the last on July 10, 1951, for deliveries of processed feathers and down from September 30, 1951 to October 31, 1952 at sales prices higher than those later fixed by CPR 87. The contracts provided for the complainant to buy all its feathers and down abroad and for title to the goods to pass to the United States when the raw goods were loaded aboard ship at foreign ports for transportation to this country and the bills of lading and other papers were endorsed to the United States. Within 10 days after title to the goods was thus transferred to the United States GSA was to pay the complainant 75% of the contract value of the goods. Thereafter the complainant was to process and package the goods in accordance with specifications and the finished goods were to be shipped to storage points designated by GSA. The contracts provided that shipments of processed goods could be made by the complainant as the goods were finished and that GSA should pay the complainant the balance of 25% of the contract value of the goods so shipped within 10 days after their final acceptance. All the contracts were specifically made subject to renegotiation under the Renegotiation Act of 1951.[13]
 
 
 4
 It will be observed that when these contracts were entered into they were subject to the flexible prices of CPR 31. However, performance of all but the first of them was not required to be completed until after October 19, 1951 when CPR 87 took effect and, as to the last four, not until after April 16, 1952 when Amendment 1 to CPR 87 took effect. Prior to April 16, 1952 the OPS had recognized that the complainant was entitled, under section 5(d) of CPR 87, to exemption from the price ceilings of that regulation on nearly all of its remaining deliveries to GSA under the contracts. But after April 16, 1952 when Amendment 1 had limited the exemption of section 5(d) to feathers and down which had been processed, inspected and approved in writing by GSA prior to that date, the complainant's remaining deliveries under its last four contracts became subject to the fixed dollars-and-cents ceilings of CPR 87 which with respect to these deliveries aggregated some $600,000 less than the aggregate prices stipulated in the GSA contracts.
 
 
 5
 The complainant completed performance of these contracts and was paid the ceiling prices of CPR 87 rather than the higher contract prices. Asserting that as thus applied to reduce the prices which GSA had contracted to pay it CPR 87 and Amendment 1 thereto were invalid, the complainant filed a protest with the Director of Price Stabilization under section 407(a)[14] of the Defense Production Act of 1950 as amended. After proceedings resulting ultimately in the dismissal as out of time of all but one of the complainant's objections to CPR 87,[15] the remaining objection to CPR 87 and all the objections to Amendment 1 were considered by boards of review who recommended that the protest be wholly denied. These recommendations were adopted by the Director, who formally denied the protest. The present complaint was thereupon filed in this court under section 408(a)[16] of the Defense Production Act of 1950 as amended. The complainant asserts that CPR 87 was void insofar as it purported to change the terms and conditions of pre-existing GSA contracts for national stock pile procurement, and that Amendment 1 to CPR 87 was invalid as applied to the complainant because it failed to effectuate in a reasonable manner any of the purposes of the Defense Production Act of 1950 and because it was discriminatory.
 
 
 6
 We consider first the complainant's contention that CPR 87 was invalid to the extent that it changed the terms and conditions of pre-existing GSA contracts. We see no merit in this contention. The Defense Production Act of 1950[17] expressly authorized the imposition of price ceilings on transactions to which the Government was a party, including transactions involving Government purchase of materials pursuant to contracts entered into after the passage of the Act but prior to the imposition of price ceilings. Thus section 402(b) (1)[18] of the Act authorized the issuance of regulations establishing price ceilings on the sale or delivery of any material or service "by or to any person" and section 702(a)[19] defined "person" as including "the United States or any agency thereof," while section 402(d) (1)[20] provided that "Regulations and orders issued under this title shall apply regardless of any obligation heretofore or hereafter incurred, except as provided in this subsection", an exception not here relevant. These provisions are clear and unambiguous and plainly authorized the application of price ceilings to the material delivered under the complainant's contracts with GSA. Moreover these contracts were all entered into after and, therefore, in the light of the enactment of the Defense Production Act, and after price ceilings had actually been established thereunder. Accordingly a further exercise of the existing price control power was necessarily within the contemplation of the parties and constituted an implied term of the contracts. We, therefore, do not reach the constitutional argument which the complainant seeks to make.
 
 
 7
 The complainant also urges that CPR 87 was invalid because, as applied to pre-existing GSA contracts for national stock pile procurement, it destroyed contractual obligations to deliver strategic and critical materials which was contrary to the primary intention of Congress in enacting the Defense Production Act of 1950 as well as the Strategic and Critical Materials Stock Piling Act. But we think that the assumption is fallacious that effective stock pile procurement cannot bear the imposition of price ceilings, ceilings imposed in part at least to conserve defense appropriations. For the record in this case demonstrates that the objectives of price control and the stock piling of strategic and critical materials are not only in harmony in the abstract but were, in fact, completely harmonized in practice. Thus it was the Munitions Board itself, among others, that requested the imposition of dollars-and-cents ceiling prices on purchases of feathers for the stock pile. The evidence shows that under the ceiling prices imposed by CPR 87 and Amendment 1 the feathers desired for the stock pile were obtained and the complainant does not suggest that those ceiling prices were generally unfair or inequitable.
 
 
 8
 The provisions of section 303[21] of the Defense Production Act of 1950 do not support the complainant's contention. It is true that section 303(b) authorized the purchase of critical and strategic materials at higher than currently prevailing market prices under certain specified circumstances determined by the purchasing agency. But the feathers and down procured from the complainant were not purchased under section 303 and there is no suggestion of any determination of special circumstances which would, under section 303 (b), have authorized the payment of higher than currently prevailing market prices. In this setting "currently prevailing market prices" undoubtedly meant "established ceiling prices"[22] as was subsequently made explicit by amendment of section 303(b).[23]
 
 
 9
 We turn then to the complainant's contention that as applied to it Amendment 1 to CPR 87 was invalid because it failed to effectuate in a reasonable manner any of the purposes of the Defense Production Act and because it was discriminatory. We think that both of these contentions are well taken.
 
 
 10
 The Director specifically set forth his reasons for the exemption originally accorded in section 5(d) of CPR 87 on October 19, 1951, as follows:
 
 
 11
 "In the course of its procurement activities GSA has entered into some contracts calling for future delivery of imported waterfowl feathers. Processors holding these bona fide future contracts have purchased substantial quantities of imported feathers with which to complete them. In order not to disturb GSA's procurement program and to prevent hardship and inequity to these contracting processors this regulation permits these contracts to be fully or partially completed at the contract price, to the extent the processor has made bona fide purchases of the raw stock with which to complete deliveries under the contract."[24]
 
 
 12
 Six months later, when issuing Amendment 1 to CPR 87, the Director stated that since October 19, 1951, information had been made available to him indicating that feathers purchased for the fulfillment of GSA contracts entered into prior to October 19, 1951, might be sold at the dollars-and-cents ceiling prices of the regulation without resulting in hardship or inequity to the sellers involved. Furthermore, the imposition of the ceiling prices of CPR 87 had in no way inhibited the GSA stock pile procurement effort. The Director concluded from this fact that the broad exemption of section 5(d) was unnecessary to assure adequate GSA procurement.[25] These were the two considerations which had motivated the establishment of that exemption and the Director found them no longer valid. Therefore, he concluded that the need for the exemption was gone and he accordingly revoked it.
 
 
 13
 The fact is, however, that at the time of the revocation of the exemption all of the feathers and down which section 5(d) had exempted from price control[26] had been brought to this country, title to them had been vested in the United States, and they were then either being processed or in storage awaiting that treatment. All this procurement for GSA had taken place while the exemption was in force. Indeed, except for the four uncompleted contracts with this complainant and two other comparatively small contracts with other sellers, all of the exempt purchase contracts had been fully performed during that period. Obviously under these circumstances the exemption was no longer needed to assure the government procurement of feathers and down. For the exemption affected only goods to be supplied under these existing contracts and nearly all those goods were already in this country with title thereto held by the United States. The revocation of the exemption, therefore, could have had no effect on future sales or procurement of feathers and down since these were already subject to the price ceilings of CPR 87. But because the exemption could be revoked without affecting the GSA procurement program it does not follow that its revocation might not impose hardship and inequity upon the complainant. We agree that from the complainant's standpoint it was highly arbitrary and unreasonable at this late stage of the performance of its contracts to revoke the exemption and thereby to compel it to accept for its feathers and down some $600,000 less than GSA had contracted to pay.
 
 
 14
 The respondent asserts that the revocation of the exemption by Amendment 1 nonetheless effectuated the purposes of the Defense Production Act by tending "to assure that defense appropriations [were] not dissipated by excessive costs and prices" pursuant to the mandate of section 401[27] of the Act. We think, however, that in the light of the existence of the Renegotiation Act, to which as we have seen the complainant's contracts were expressly made subject, this objective of the Defense Production Act must be read as not contemplating price regulations whose sole effect would be to eliminate excessive profits derived by a contractor from his government contracts. We think that Congress intended that a contractor in the complainant's position should have the benefit of the much more appropriate procedure for that purpose which was provided by the Renegotiation Act and should not have his profits from valid contracts with a government agency swept away without regard to the equities of his individual case by the application of such a broad brush as was used by the Director in this case. We conclude that Amendment 1 was invalid because it failed to effectuate in a reasonable way any purpose of the Defense Production Act. We need only add that under the Renegotiation Act the "windfall" profits of which the Director was seeking to deprive the complainant by Amendment 1 may, if they are found to exist, be eliminated with fairness to both the Government and the complainant.
 
 
 15
 We think also that Amendment 1 was invalid because it was discriminatory. The amendment was not promulgated until after all of the contractors whose procurement of feathers and down was exempt under section 5(d) except the complainant (and two other small contractors who had agreed to accept subsequently imposed ceiling prices) had completed their contracts and received payment of their full contract prices under the aegis of the exemption. The complainant alone was compelled to accept the lower ceiling prices in lieu of the higher contract prices for a substantial amount of the feathers and down which it had sold and assigned to GSA prior to the promulgation of Amendment 1 and which had then been exempt from ceiling prices. This occurred only because the complainant's contracts, being for much larger quantities than those of its competitors, had provided for schedules of deliveries extending over a longer period which overlapped April 16, 1952, the effective date of Amendment 1. In thus singling out the complainant from all the members of its class for special price reduction treatment merely because its larger deliveries were necessarily extended into a later period the amendment laid upon the complainant greater burdens than were laid upon others in the same calling and condition. In so doing the amendment was arbitrary and discriminatory and, therefore, invalid. Hawaii Brewing Corporation v. Bowles, Em.App.1945, 148 F.2d 846; Booth Fisheries Corporation v. Bowles, Em.App.1946, 153 F.2d 449; Tanners Hides, Inc., of Texas v. Kendall, Em. App.1955, 219 F.2d 710.
 
 
 16
 A judgment will be entered declaring Amendment 1 to Ceiling Price Regulation 87, issued April 15, 1952 under the Defense Production Act of 1950 as amended, invalid from its inception.
 
 
 
 Notes:
 
 
 [1]
 16 F.R. 10777
 
 
 [2]
 17 F.R. 3375, effective April 16, 1952
 
 
 [3]
 The Strategic and Critical Materials Stock Piling Act, as amended, 50 U.S.C.A. § 98 et seq
 
 
 [4]
 16 F.R. 3339, 8271
 
 
 [5]
 16 F.R. 808, issued by the Office of Price Stabilization pursuant to the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix, § 2061 et seq
 
 
 [6]
 16 F.R. 4184, effective May 9, 1951
 
 
 [7]
 Amendment 22 to the General Ceiling Price Regulation, 16 F.R. 10781, 11770; Amendment 2 to General Overriding Regulation 4, 16 F.R. 10782
 
 
 [8]
 16 F.R. 10777
 
 
 [9]
 16 F.R. 10777, 10779
 
 
 [10]
 17 F.R. 3375
 
 
 [11]
 17 F.R. 4342
 
 
 [12]
 18 F.R. 1477, 1567
 
 
 [13]
 50 U.S.C.A.Appendix, § 1191
 
 
 [14]
 50 U.S.C.A.Appendix, § 2107(a)
 
 
 [15]
 See Purofied Down Products Corp. v. Freehill, Em.App.1953, 202 F.2d 166
 
 
 [16]
 50 U.S.C.A.Appendix, § 2108(a)
 
 
 [17]
 50 U.S.C.A.Appendix, § 2061 et seq
 
 
 [18]
 50 U.S.C.A.Appendix, § 2102(b) (1)
 
 
 [19]
 50 U.S.C.A.Appendix, § 2152(a)
 
 
 [20]
 50 U.S.C.A.Appendix, § 2102(d) (1)
 
 
 [21]
 50 U.S.C.A.Appendix, § 2093
 
 
 [22]
 Cf. United States v. Commodities Trading Corp., 1950, 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707
 
 
 [23]
 Section 103(a) of the Defense Production Act Amendments of 1951, 65 Stat. 131, 133
 
 
 [24]
 16 F.R. 10778
 
 
 [25]
 17 F.R. 3375
 
 
 [26]
 With the exception of 8,250 pounds of European goose down not yet received from abroad
 
 
 [27]
 50 U.S.C.A.Appendix, § 2101