**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY**

**v.**

**The UNITED STATES.**

**No. 310–64.**

United States Court of Claims.

March 17, 1967.

Davis and Skelton, JJ., dissented in part.

Gerald D. Morgan, Washington, D. C., for plaintiff. H. H. Holt, Jr., Newport News, Va., Lee I. Park, K. Martin Worthy and John W. Pettit, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

NICHOLS, Judge.*

Plaintiff had a contract with the Navy under which it constructed the aircraft carrier RANGER. Article 6 of the contract provided for an upward or downward adjustment in the contract price for changes in labor and material costs during the period of construction. However, Article 6(e) authorized the contracting officer to deny, in whole or in part, any upward adjustment if he found that it was not required, in whole or in part, to enable the contractor to earn a fair and reasonable profit under the contract. In accordance with the formulae set forth in Article 6, a labor and materials adjustment upward in the amount of $7,284,236.45 was applicable in plaintiff's case. The contracting officer denied the adjustment in full on the ground that the profit already accrued was considered fair and reasonable within the meaning of Article 6(e). The denial was affirmed by the Armed Services Board of Contract Appeals (ASBCA No. 6565). Plaintiff seeks judgment here for $7,-284,236.45 contending (1) that Article 6(e) was illegal as in conflict with statute; (2) that the contracting officer's action was abitrary and capricious and that such action infected the proceedings before the Board; (3) that the decision of the Board as to what constitutes a

---

* Although we disagree in part with the result reached by Commissioner Maletz, we agree in part, and have borrowed major portions of his opinion, and acknowledge the assistance which the whole of it has rendered to the court.

"fair and reasonable profit" under Article 6(e) was a question of law and thus not final; and (4) that in any event, the Board decision was arbitrary, capricious and unsupported by substantial evidence.

The events that led to the controversy were these: In October 1953, plaintiff, and other shipyards, received from the Navy's Bureau of Ships an invitation to submit a proposal for the preparation of plans for and the construction of an aircraft carrier, subsequently commissioned the USS RANGER. The invitation requested the bidders "to quote a firm price, using enclosure 1 and the attached price analysis form for that purpose" and specified that "[t]he price shall be subject to adjustment for escalation for labor and material, and shall be based upon delivery * * * 44 months after award." [1] As to "escalation for labor and material", the invitation provided:

> D. *Sample Labor and Material Escalation Article*—An article substantially the same as the attached sample clause (Enclosure 4) will be inserted in any contract awarded on the basis of escalation for labor and material. The base month for both the labor and material sections will be October 1953.

The sample clause "Price Adjustment" which the Navy furnished to bidders provided for an adjustment, upward or downward in the contract price, tied to a "Labor Index" and a "Materials Index" compiled for relevant periods by the Bureau of Labor Statistics of the United States Department of Labor.[2] The sample clause also contained the following provision:

> (e) The Contracting Officer may deny, in whole or in part, any upward adjustment in the contract price required under this Article if the Contracting Officer finds that such adjustment is not required, in whole or in part, to enable the Contractor to earn a fair and reasonable profit under this contract.

In compliance with the invitation, plaintiff, on January 7, 1954, submitted a bid and unit price analysis to the Navy in the total amount of $117,750,000, subject to an escalation adjustment upward or downward for labor and material.[3] In

1. The invitation stated that "price may not be the controlling factor in determining the successful bidder" and that "[c]onsideration will also be given to factors relating to the national defense."

2. More particularly, the sample clause provided:

"ARTICLE. *Price Adjustments.*—(a) The total contract price is subject to adjustment for changes in labor and material costs in accordance with the following provisions:

"(i) Labor.—Adjustment with respect to labor costs shall be made on the basis of monthly average hourly earnings, excluding *wage premiums on account of overtime and shift work*, in the following shipyards: * * * as furnished to the Department by the Bureau of Labor Statistics, * * * (hereinafter called the "Labor Index"). Adjustments shall be determined by the * * * [Navy] (Cost Inspection Service) with respect to each calendar quarter. * * *

"(ii) Materials.—Adjustment with respect to materials shall be made on the basis of the Materials Index for Group 10, Metals and Metal Products, as furnished to the Department by the Bureau of Labor Statistics, * * * (hereinafter called the "Materials Index"). Adjustments shall be determined by the * * * [Navy] (Cost Inspection Service) with respect to each calendar quarter. * * *

* * * * *

"(c) Adjustments under this Article will be deferred until final settlement, but the Government may make partial payments under this Article, subject to such conditions precedent as the Contracting Officer may prescribe. * * *"

3. In addition to plaintiff's bid, the Navy received bids for construction and delivery of the vessel from two other shipbuilders, Bethlehem Steel Corporation and New York Shipbuilding Corporation. Bethlehem submitted a bid in the amount of $146,064,000, subject to price redetermination downward or upwards at 70 percent of completion of construction. New York Shipbuilding Corporation submitted a bid at a fixed price of $159,433,195, subject to adjustment upward or downward for changes in labor or material

computing this total bid price of $117,-750,000, plaintiff's unit price analysis reflected the following breakdown: $110,-387,000 for total estimated costs and a proposed profit of 6.67 percent $7,363,-000) on total estimated Costs.[4] The RANGER contract was to be on a negotiated fixed price basis and plaintiff considered that the Navy was entitled to rely on the relative accuracy of its (plaintiff's) unit price analysis (including the 6.67 percent profit figure) in evaluating the reasonableness of its bid price and negotiating the contract.[5]

In February 1954, plaintiff received notice that the Navy had awarded it the RANGER contract and in due course a contract was executed effective as of February 3, 1954. The contract contained in its special provisions an Article 6 "Price Adjustments", substantially identical to that furnished to plaintiff as a sample clause during bidding. In particular, the language of subsection (e) of Article 6 of the contract was identical to the previously quoted language of subsection (e) of the sample clause.

Article 11(d) of the special provisions of the contract provided that the "contract shall be subject to any act of the Congress, whether heretofore or hereafter enacted and to the extent indicated therein, providing for the renegotiation of said contract and shall be deemed to contain all the provisions required by any such act without subsequent amendment of this contract specifically incorporating such provisions." [6]

Article 11(f) of the special provisions of the contract further provided that "The contractor agrees that, unless otherwise provided by law, this contract shall be subject to all provisions of the Vinson-Trammell Act as amended and extended (34 U.S.Code, 496, * * *) and shall be deemed to contain all the agreements required by Section 3 of said Act. * * * " [7]

Plaintiff, in accordance with the contract, constructed and delivered the RANGER to the Navy on August 8, 1957 —55 days prior to the last date for delivery specified by the contract (October 2, 1957). The record is undisputed

costs, with a request for contribution by the government toward the cost of construction of additional facilities in the amount of $1,600,000.

4. Previously, in connection with its negotiations with the Navy for a contract covering construction of the aircraft carrier FORRESTAL, plaintiff had submitted a unit price analysis showing a proposed profit of 8.5 percent of estimated costs.

 * * * * *

5. During the ASBCA proceedings, the parties employed percentage figures relating to profit which were computed both as a percentage of cost and as a percentage of price. Obviously, a percentage amount based on cost results in a higher profit percentage figure than a percentage amount based on price.

6. On February 3, 1954, the date as of which the RANGER contract was entered into, there was no renegotiation law in effect, the Renegotiation Act of 1951 having expired on December 31, 1953 (65 Stat. 7, 8). However, on September 1, 1954, the Renegotiation Act of 1951 was extended retroactively and made applicable to receipts or accruals attribu-

table to performance, under contracts, after December 31, 1953 (68 Stat. 1116).

7. As of February 1954, when the RANGER contract was entered into, the Vinson-Trammell Act (which since 1956 has appeared in 10 U.S.C. § 7300) provided in part (34 U.S.C. (1952) § 496): "* * * [N]o contract shall be made by the Secretary of the Navy for the construction and/or manufacture of any complete naval vessel * * *, or any portion thereof * * * unless the contractor agrees * * * [t]o pay into the Treasury profit * * * in excess of 10 per centum of the total contract prices, for the construction and/or manufacture of any complete naval vessel or portion thereof, * * * of such contracts within the scope of this section as are completed by the particular contracting party within the income taxable year, such amount to become the property of the United States * * *." The Act further provided that if the amount of excess profits was not voluntarily paid, "the Secretary of the Treasury shall collect the same under the usual methods employed under the internal-revenue laws to collect Federal income taxes."

that plaintiff's performance in the construction of the vessel was excellent; that the vessel reflected high standards of design and workmanship; that the vessel performed efficiently; and that it required few, if any, corrections of deficiencies after its trials. Indeed, plaintiff's work in constructing the RANGER was the subject of highly congratulatory letters it received from high-ranking naval officials including the Secretary of the Navy and the Commandant of the Fifth Naval District.

During performance of the contract, additions to the price for changes, etc. (exclusive of labor and material escalation under Article 6) amounted to $11,082,893.17 (including a profit of $791,741), resulting in a total contract price of $128,832,893.17. Plaintiff's final completion cost for the RANGER amounted to $117,570,808.90. Thus, plaintiff's actual profit on the RANGER, without Article 6 escalation, amounted to $11,262,084.27, or 9.58 percent of the cost of its construction (8.74 per cent of the final price absent Article 6 escalation) as compared with plaintiff's estimated profit in its bid submission of $7,363,000, or 6.67 percent of cost (6.51 per cent of price).

On September 30, 1958, pursuant to Article 6 of the special provisions, plaintiff submitted to the Navy a voucher and related papers covering price adjustments upward in the amount of $7,284,236.45 for changes in labor and material costs. There is no dispute that under the formulae of Article 6, an upward adjustment in the contract price was applicable on account of labor and materials escalation in the amount of $7,284,236.45. Nor was it disputed in the administrative proceeding that plaintiff actually incurred additional costs in at least that amount on account of increased wage rates and material costs accruing during construction of the RANGER. By a letter dated April 1, 1959 to the contracting officer, plaintiff outlined "considerations which support our claim that we are entitled to the reimbursement of the full amount of escalation due us in accordance with Article 6 of the Special Provi-

sions of the contract." In that letter plaintiff compared its RANGER profit figures with those it experienced on other recent Navy contracts involving the FORRESTAL and several LST's. It also stated that it was able to effect increases in efficiency resulting in final costs on the RANGER being less than estimated; that its profit on the RANGER must be considered in light of loss of interest on the amounts due it under the contract but unpaid since delivery of the vessel in August 1957; that the company's profits on all its renegotiable government work during the period covered by the Renegotiation Act, including the full profit on the RANGER, had averaged only 6.97 percent of price after provision for State but before provision for Federal income taxes; that plaintiff had a policy of retaining a large share of earnings in the business for plant improvement and replacement and that it was imperative that it be allowed profits as earned if it were to continue this practice and remain a strong and competent supplier of vessels to the Navy; and that in view of its overall performance in building the RANGER, its adjustment claim should be honored as presented.

By letter of July 10, 1959 to the contracting officer, plaintiff again requested payment for labor and material escalation and pointed out that it was able to effect performance efficiencies in the execution of the contract. It also stated that the contract was awarded on a competitive basis and that in its opinion the situation with respect to being truly competitive fell within the statement contained in a Bureau of Ships circular letter of June 26, 1959 that "In the administration of contracts containing this [escalation] feature, we have taken the position that profit resulting from performance efficiencies should not be limited or reduced by invoking the (profit limiting) feature."

By letter dated June 1, 1960 the contracting officer denied plaintiff's request for labor and material escalation, stating:

The profit earned under this contract, without adjustment for escalation,

amounts to in excess of $11,000,000, or about 9.5 percent of costs. If the requested adjustment were made, a profit in excess of $18,000,000, or more than 15 percent of costs would result. Under Article 6(e) of the Special Provisions of Contract NObs–3557, the Contracting Officer may deny any escalation adjustment, otherwise in accordance with Article 6, which is not required to enable the Contractor to earn a fair and reasonable profit under the contract. Considering all relevant factors, the profit already accrued is considered fair and reasonable within the meaning of Article 6(e). Accordingly, your claim for an upward adjustment in the price of Contract NObs–3557 is denied.

Plaintiff noticed its appeal under the disputes clause from the contracting officer's decision and thereafter filed a complaint with the ASBCA challenging the decision as illegal, arbitrary and capricious and not supported by substantial evidence. The complaint alleged that the contracting officer had failed to give due recognition to: plaintiff's outstanding performance, ingenuity, know-how and ability in constructing the RANGER; the savings effected by the United States; excellence of the vessel; and the magnitude of the risk assumed by plaintiff. The complaint also alleged that the contracting officer failed to consider losses sustained by plaintiff on other contracts which were subject to the Renegotiation Act of 1951 and failed to use any standard, formula or method to guide and direct him in determining what was a "fair and reasonable profit." [8]

A hearing was held, following which the Board issued a decision denying the

appeal on the ground that "[t]he evidence and Appellant's arguments do not convince us that $11,262,084.27 is less than a fair and reasonable profit." "We conclude," the Board said, "that upward escalation of the contract price is not required, in whole or in part, to enable Appellant to earn a fair and reasonable profit under this contract."

### The Vinson-Trammell Act

The Vinson-Trammell Act (note 7, supra) provides that profits on contracts for the construction of complete naval vessels in excess of 10 percent of the aggregate of the contract prices for contracts covered by the Act and completed within the taxable year are required to be paid into the Treasury. Plaintiff argues that the Vinson-Trammell Act was in full force and effect in February 1954 when the RANGER contract was entered into; that it continued effective until September 1954 when it was suspended by section 102 of the Renegotiation Act of 1951; that the validity of a provision is determined as of the date the contract is made; and that as of the date of execution of the RANGER contract, Article 6(e) was invalid as in conflict with the Vinson-Trammell Act. It seems clear, however, that the Vinson-Trammell Act was in no way applicable to the RANGER contract inasmuch as the Renegotiation Act of 1951, as amended, was made applicable by the contract, Article 11(d), and by its own terms and section 102(d) of that Act (65 Stat. 8, 50 U.S.C. App. (1952) § 1212(d)) specifically suspended the operation of the profit limitation provisions of the Vinson-Trammell Act with respect to contracts subject to renegotiation.[9] It is quite

---

8. Plaintiff's complaint also attacked the validity of Article 6(e) of the contract, claiming that it was repugnant to, and in conflict with, the Renegotiation Act of 1951. It alleged, in addition, that denial of the escalation constituted a "taking" of plaintiff's property without due process, prohibited by the Fifth Amendment. On motion of government counsel, the Board dismissed the challenge to the validity of Article 6(e) and the constitutionality of the contracting officer's action on the

basis that they involved disputed questions of law outside the Board's jurisdiction.

9. The Renegotiation Act of 1948, which was the forerunner of the Renegotiation Act of 1951, was originally enacted without any mention being made of the Vinson-Trammell Act. In 1949, however, in section 622(b) of the National Military Establishment Appropriation Act of 1950 (63 Stat. 987, 1021) Congress made the

true that in February 1954—when the RANGER contract was entered into—there was no renegotiation law in effect, the Renegotiation Act of 1951 having expired on December 31, 1953. See note 6, supra. But under Article 11(d), not only was the possibility of a retroactive extension of the renegotiation law recognized, the contract was expressly subject to any such extension to the extent indicated therein—a contemplated contingency which came to pass when in September 1954 the Renegotiation Act of 1951 was extended retroactively and made applicable to receipts or accruals after December 31, 1953 (ibid), thus suspending *ipso facto* the Vinson-Trammell Act not as of September 1954, as plaintiff says, but retroactively to January 1, 1954.[10] Moreover, the termination date of the Renegotiation Act was successive-

ly extended to encompass the entire period in which plaintiff had " * * * receipts and accruals attributable to performance * * *." of the RANGER contract.[11] In short, the action of the Congress in extending such coverage, both prospectively and retroactively, resulted in a situation in which there was no period of time when the Renegotiation Act was not applicable to the receipts from the RANGER contract or, as a corollary, when the Vinson-Trammell Act was applicable.

█ Even if it were to be assumed contrary to fact that the Vinson-Trammell Act was applicable, there is no possible basis to read into its terms a provision which assures a contractor, regardless of the provisions of his contract, at least a 10 percent profit on all his covered contracts, if earned, or which infer-

Vinson-Trammell Act inapplicable to all contracts subject to the Renegotiation Act because of the conflicting provisions of the two acts when applied to the same contract. As explained by the Senate Appropriations Committee (S.Rept. 745, 81st Cong., 1st Sess., p. 12 (1949) : "The Vinson-Trammell Act is applied on a completed contract basis. Renegotiation operates on an over-all fiscal year basis and takes into account receipts and accruals from all contracts being performed in a given fiscal year regardless of their state of completion. When both acts are applied simultaneously to the same contracts it is necessary to determine for the purpose of applying the Vinson-Trammell Act the portion of the profits determined to be excessive in renegotiation which relate to each contract. Thus, in order to make possible the administration of the Vinson-Trammell Act, it becomes impossible to administer the Renegotiation Act in the manner contemplated by law, namely, on an over-all basis." See 63 Stat. 987, 1021 (1949) ; 64 Stat. 595, 754 (1950).

10. The fact that the Renegotiation Act was amended to apply retroactively does not render it unconstitutional. See e. g., Warner & Swasey Co. v. War Contracts Price Adjustment Board, 91 U.S.App. D.C. 330, 201 F.2d 201 (1952), cert. denied 345 U.S. 924, 73 S.Ct. 782, 97 L.Ed. 1355; Eastern Machinery Co. v. Under Secretary of War, 86 U.S.App.D.C. 331, 182 F.2d 99, 100 (1950) ; Ring Const. Corp. v. Secretary of War, 85 U.S.App.

D.C. 386, 178 F.2d 714 (1949), cert. denied 339 U.S. 943, 70 S.Ct. 796, 94 L.Ed. 1358; Blanchard Mach. Co. v. RFC, 85 U.S.App.D.C. 361, 177 F.2d 727, 729–730 (1949), cert. denied 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338. Plaintiff points out, however, that the validity of a contract is determined as of the date the contract is made, and maintains that if a provision is illegal when the contract was made, it could not be legalized by subsequent changes in the law. It cites in this connection Rutkin v. Reinfeld, 229 F.2d 248 (2d Cir., 1956), cert. denied 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956), and Fitzsimons v. Eagle Brewing Co., 107 F.2d 712, 126 A.L.R. 681, (3d Cir., 1939) which hold that if a contract when made is illegal under a statute, the repeal of the statute does not validate contracts previously illegal under it unless there is a plain indication of a contrary legislative intent. See also Restatement, Contracts § 609; Corbin Contracts § 1532. The cases cited are not in point since they do not deal with the principle of retroactive statutory application.

11. Section 102(a) of the Renegotiation Act of 1951 (50 App.U.S.C. (1952 ed.) § 1212 (a)), 65 Stat. 7—termination date, December 31, 1953; 68 Stat. 1116 (1954)—termination date, December 31, 1954; 69 Stat. 447 (1955)—termination date, December 31, 1956; 70 Stat. 786 (1956)—termination date, December 31, 1958; 72 Stat. 1789 (1958)—termination date, June 30, 1959; 73 Stat. 210 (1959)—termination date, June 30, 1962; etc.

entially defines a profit of 10 per cent of the contract price as a fair and reasonable profit, as plaintiff contends. The purpose of the Act was to prevent inordinate profits by prescribing a *maximum* profit limitation of 10 percent on the gross amount of covered contracts, with the excess to be recaptured by the Treasury.

### The Renegotiation Act

■ Plaintiff further argues that Article 6(e) of the RANGER contract became doubly invalid when the Renegotiation Act of 1951 was extended on September 1, 1954, to apply to all receipts and accruals after December 31, 1953. It maintains that the Article was contrary to and in conflict with the whole purpose of the Renegotiation Act and contends that that Act's declaration of policy (50 U.S.C. App. § 1211) implies a definite policy of Congress that all excessive profits from contracts with the United States are to be eliminated through renegotiation under the Renegotiation Act and not otherwise.[12] It says that Article 6(e) is, for all practical purposes, an administrative "Vinson-Trammell" device; that the legislative history of the Renegotiation Act of 1951 clearly shows that the Vinson-Trammell Act and renegotiation could not possibly work together; that similarly renegotiation and a profit impairment provision like Article 6(e) cannot work together; and that Congress intended renegotiation to be the exclusive means for determining and recovering excessive profits. For the reasons that follow, we cannot agree.

■ In the first place, the Renegotiation Act provides for the recovery of excessive profits not on a contract-by-contract basis, but upon the basis of all receipts and accruals from all covered contracts during the relevant fiscal year. 50 U.S.C. App. § 1213(f). Under renegotiation, the contractor's costs are determined, on an overall fiscal year basis, based upon deductions allowable under the Internal Revenue Code—not upon cost standards established by the Armed Services Procurement Regulations. It is not inconsistent with the policy of the Renegotiation Act for the government, in its negotiation and administration of contracts, to attempt to eliminate excessive profit other than by renegotiation. It was incumbent upon government procurement officials to administer contracts to insure that the prices obtained were fair and reasonable. 32 CFR (Rev. 1954, Cum.Supp. Jan. 1960), § 3.808–1. But if negotiations pursuant to contractual price redetermination,[13] or escalation provisions, etc., still result in contractors obtaining excess profits on the basis of over-all receipts and accruals during a fiscal year, then the Renegotiation Act provides a procedure to recapture the excess—establishing what amounts to a last chance for the elimination of excessive profits. Renegotiation is thus "focused on recapture of excessive profits rather than on prevention by repricing;" it is "a supplement to effective Renegotiation Act of 1951, 66 Harv.L. Rev. 270, 276, 312–13 (1952).

12. § 1211 "Congressional declaration of policy" provides: "It is recognized and declared that the Congress has made available for the execution of the national defense program extensive funds, by appropriation and otherwise, for the procurement of property, processes, and services, and the construction of facilities necessary for the national defense; that sound execution of the national defense program requires the elimination of excessive profits from contracts made with the United States, and from related subcontracts, in the course of said program; and that the considered policy of the Congress, in the interests of the national defense and the general welfare of the Nation, requires that such excessive profits be eliminated as provided in this title."

13. "Normally, prices are redetermined so as to remove excess profits and to leave contractors with their normal profits, plus any additional profits they may prove they are entitled to as a result of special efforts or contributions, or unusual manufacturing economies, or the assumption of extraordinary risks, etc. The general theory is that a manufacturer should not make abnormal profits from the nation's war or defense effort." See International Harvester Co. v. United States, 342 F.2d 432, 445, 169 Ct.Cl. 821, 845, (1965).

Nor does the Renegotiation Act prohibit in any way the insertion of profit determination or profit limitation clauses in government contracts. To the contrary, the Act impliedly recognizes that they may be employed by authorizing the Renegotiation Board to exempt from renegotiation "any contract * * or performance thereunder during a specified period or periods if in the opinion of the Board, the provisions of the contract are otherwise adequate to prevent excessive profits. * * * " 50 U.S.C. App. § 1216(d) (3). See 32 CFR (Rev.1954) § 1455.4(c). Added to this, the regulations of the Board make specific provision for the treatment in renegotiation proceedings of contracts containing escalation, price redetermination or other price revision features. 32 CFR (Rev.1954) §§ 1457.5, 1460.2(b); 32 CFR (Rev.1954, Cum.Supp. Jan. 1, 1961) § 1460.9(b) (5).

It would seem too that if Congress intended to outlaw contractual profit limitation provisions or price redetermination proceedings, in favor of statutory renegotiation, it would have enacted specific legislation to that effect. Thus, when Congress wished to suspend the operation of the Vinson-Trammell Act in favor of the Renegotiation Act, it did so specifically and with clarity. Plaintiff asserts, however, that Purofied Down Products Corp. v. Kendall, 244 F.2d 723 (Em.Ct. App.1957) supports its position that the Renegotiation Act preempts the field of "fair profit" determination. In that case the court invalidated a price-ceiling regulation issued under the Defense Production Act of 1950 (50 U.S.C. App. § 2101) which was designed to eliminate excessive profits derived by a contractor from his government contracts. The court held that in light of the existence of the Renegotiation Act, to which the complainant's contracts were expressly subject, the Defense Production Act was not to be construed as contemplating a price regulation whose sole effect would be the elimination of excessive profits from government contracts. The court said (244 F.2d at 728): "We think that

Congress intended that a contractor in the complainant's position should have the benefit of the much more appropriate procedure for that purpose which was provided by the Renegotiation Act and should not have his profits from valid contracts with a government agency swept away without regard to the equities of his individual case by the application of such a broad brush as was used by the Director in this case. We conclude that * * * [the regulation] was invalid because it failed to effectuate in a reasonable way any purpose of the Defense Production Act. We need only add that under the Renegotiation Act the 'windfall' profits of which the Director was seeking to deprive the complainant by * * * [the regulation] may, if they are found to exist, be eliminated with fairness to both the Government and the complainant." From this it would seem evident that *Purofied* was concerned with the question of construction of the Defense Production Act to determine whether it authorized the Director of Price Stabilization to issue the price regulation in question. The present case, on the other hand, is concerned not with any question of construction of Article 6 (e), but rather with administration of an express contractual agreement negotiated by the parties. Thus, *Purofied* would seem irrelevant to any issue here.

Plaintiff insists, also, that since renegotiation applies to all government contracts on a fiscal year basis, while a profit limitation provision such as Article 6(e) applies to a single contract on a completed contract basis, the Renegotiation Act and Article 6(e) cannot possibly operate together. It illustrates with the following hypothetical case: In 1954 the Renegotiation Board found that a contractor had received or accrued from all of its contracts with the government (including escalation accrued under a particular contract for that year) $1,000,000 of excessive profits and the Board's determination had become final in 1957, prior to completion of the contract in 1958. In such circumstances, plaintiff says, if the Navy looked solely to the con-

tract in 1958 and found that with escalation the contractor would have an excessive profit on that contract, considered apart from all others, and denied escalation, there would be a possible doubling up on profit recapture. Since renegotiation is determined on an over-all basis, without regard to profit or losses on any specific contract, plaintiff observes that it would be impossible to determine what part of the $1,000,000 repaid to the government for 1954 represented a part of the profit earned by the contractor that year under the contract in question. Plaintiff adds that it could not be assumed by the Navy in applying Article 6(e) in 1958 that none of the profit on the contract in question in 1954 constituted a part of the $1,000,000 found excessive by the Renegotiation Board and already refunded to the Government, for without the profit accrued on such contract (taking escalation into account), the Board may have found no excessive profit at all for that year, or in any event less than $1,000,000. This is a mere hobgoblin, in view of the Renegotiation Board's specific provisions for such contingencies, cit. supra.

Further, the record reflects that the Renegotiation Board has in fact performed its review of plaintiff's profits without suffering any apparent hindrance. The situation was clearly foreseeable when plaintiff bid and is one under which it contracted to operate. Whatever valid objections there may be to subjecting the same contract to two more or less inconsistent systems of profit limitation procedures are properly to be addressed, not to this court, but to the procurement authorities or to the Congress, which has in the past considered them (H.R.Doc. 322, 87th Cong., 2d Sess., pp. 50–4, 1962); 108 Cong.Rec. 12262–68 (1962).

### Board Proceeding and Decision

 We come now to the administrative proceedings and determinations starting with the contracting officer's decision denying the claim on the ground (as previously observed) that "Considering all relevant factors, the profit already accrued is considered fair and reasonable within the meaning of Article 6 (e)." We discuss *infra* what "relevant factors" he thus stated he considered. As noted before, the Board, after hearing, denied plaintiff's appeal holding that the evidence and plaintiff's arguments did not convince it that $11,262,084.27 was less than a reasonable profit, and that upward escalation of the contract price was not required, in whole or in part, to enable plaintiff to earn a fair and reasonable profit under the contract.[14]

Addressing itself to the contentions of plaintiff,[15] the Board found that the claimed benefits from the savings in time in completing the vessel 55 days prior to the last day specified in the contract accrued to plaintiff, as well as the government; that while the plaintiff had contended that its foresight and ingenuity saved money with respect to various inevitable changes, there was no evidence that compensation was not provided by price increases heretofore accomplished which incorporated profit; that plaintiff had the advantage of a substantial amount of experience under the contract it had with the Navy for construction of the aircraft carrier FORRESTAL and

---

14. Since complete relief was available to plaintiff under the disputes clause of the contract, the fact that one of the counts in plaintiff's petition (Count IV, par. 401) seeks recovery for breach of contract does not entitle plaintiff to a *de novo* trial here on the factual questions decided by the Board. See e. g., Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837, 170 Ct.Cl. 757, 763–764 (1965).

15. Plaintiff argued before the Board that the profit earned was not fair and reasonable in not reflecting: (a) the efficiency of plaintiff, with particular regard to quality production, reduction in costs, and economy in the use of materials, facilities and manpower; (b) early delivery of the vessel; (c) substantial savings to the government; (d) ingenuity, know-how and ability; (e) excellence of the vessel and its performance; (f) the magnitude of the risk; (g) losses sustained on other contracts subject to the Renegotiation Act.

was furnished by the Navy with the purchasing data reflecting experience with the Navy-constructed SARATOGA, another of the large carriers which was the lead ship of the RANGER with respect to machinery, and that, thus, on the evidence it could not be said that plaintiff's skill or efficiency was the sole or even predominant cause of the savings under plaintiff's estimates; that the price breakdown submitted by plaintiff in support of its original price disclosed a ratio of stated profit to estimated cost which was much lower than the ratio of profit already earned to experienced cost at the present unescalated price and that, accordingly, plaintiff had already reaped the advantage of the savings in the form of greater profit; that plaintiff's experience in obtaining profit in a higher range on carriers built by it during World War II was irrelevant since the determinations relied upon were made under profit limitation provisions of the Renegotiation Act, whereas, apart from other grounds, Article 6(e) was not a limitation on profit but a limitation on upward escalation of the contract price; and that similarly irrelevant were determinations cited by plaintiff which were reached by the Renegotiation Board for particular years during performance of the RANGER contract.

The Board also stated that it was not impressed by plaintiff's contentions that the risk it undertook was great, which contentions were based on the fact that the amount of the contract substantially exceeded plaintiff's capital and that plaintiff was required to carry a large volume of expenditures pending receipt of payment from the government. With respect to these contentions, the Board found that plaintiff's capital had substantially increased and that plaintiff maintained its activities despite absence of any escalation under the RANGER contract. The Board, in addition, adverted to the ratio of profit to cost realized by plaintiff on all of its non-renegotiable business for each of the six years beginning with 1954 and found that in two instances the ratio of profit

to cost was radically in excess of the maximum which would result from full escalation of the RANGER contract price; that in two instances the ratios were substantially below that presently prevailing under the RANGER contract; and that in two instances the ratios fell between that presently prevailing under the RANGER contract and the ratio which would result if the price were escalated. In the Board's opinion, this information did not spell out a standard indicating that a profit of $11,262,084.27 was less than fair and reasonable. Also, in the Board's opinion, there was no substantial evidence that full escalation was required to enable plaintiff to earn a fair and reasonable profit under the RANGER contract.

The Board further stated that plaintiff's presentation suggested that plaintiff desired at least enough partial escalation to increase its profit to the point where the relationship of profit to cost would be the same which prevailed with respect to the FORRESTAL contract which likewise contained an escalation clause, including an Article 6(e). In this connection, the Board found that plaintiff earned a profit on the FORRESTAL absent escalation of 9.5 per cent of cost; that the price on the FORRESTAL was fully escalated so that plaintiff realized a profit of 10.43 per cent of cost; that all the circumstances favored justification of a higher ratio of profit to cost on the FORRESTAL contract than on the RANGER contract (on which plaintiff earned absent escalation a profit of 9.58 per cent of cost) and that, accordingly, the difference between the ratios of profit to cost on the two contracts did not demonstrate that the slightly lower ratio under the RANGER contract reflected a profit under the RANGER contract that was less than fair and reasonable. "The ultimate conclusion," the Board said, "would be the same if the ratio of profit to cost on the FORRESTAL were taken as a minimum standard." "Such a standard," it stated, "would be substantially met by a ratio varying from

it only by the slight margin here disclosed."

▮▮▮▮ Plaintiff attacks virtually all these findings as arbitrary, capricious and unsupported by substantial evidence, and also claims procedural errors in the administrative proceedings. Plaintiff says in the latter connection that the contracting officer failed to inform plaintiff as to what factors he considered relevant, what findings of fact he made on each factor, how he weighed those factors in arriving at a decision, or what he considered to be the meaning of Article 6(e). This, plaintiff insists, was arbitrary action which infected the entire proceeding before the Board since it imposed on plaintiff the burden of overcoming a decision the basis of which and factors considered in arriving at which were unknown to plaintiff and wholly within the control of the defendant. This argument is subject to the infirmity that the contracting officer's decision was not based upon a required hearing and was not final if appealed so that the appeal before the Board was on a de novo basis "without regard", as the Board put it, "to any errors committed by the Contracting Officer or the correctness or incorrectness of the ultimate result be reached." Nor did the lack of findings by the contracting officer render his decision invalid as contrary to due process; constitutionality in the circumstances here does not require "findings of the probative facts from which the ultimate fact is determined." Spaulding v. Douglas Aircraft Co., 154 F.2d 419, 426 (9th Cir., 1946). It follows, however, that the Board did not have before it issues in the nature of assignments of error, but rather was required to pass de novo on the entire case as laid before it. We now consider if it did this.

▮▮▮▮ It is basic to this part of the case that a dispute under Article 6(e) whether the escalation is required to enable the contractor to earn a fair and reasonable profit, is a dispute of fact to be resolved under the disputes clause, Article 33 of the general conditions. In accordance with the Wunder-

lich Act, 68 Stat. 81, 41 U.S.C. 321–322, the decision of the Board is final as to issues of fact, but reviewable for errors of law. The Board is not delegated uncontrolled discretion and its failure to apply guidelines prescribed by authority in a regulation would be an error of law. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297 (1920). Such guidelines drawn to determine reasonableness of profit, exist in ASPR, and at the time of the Board's decision were embodied in 32 CFR (Rev.1954, Cum.Supp. Jan.1960) § 3.808–1 and § 3.808–2, which are set forth for ready reference in the appendix to this opinion. (They have since been amended and this discussion of course relates to the guidelines as they were then.) They applied to prices on all types of contracts and to revised prices as well as initial prices, § 3.800. The exercise of judgment how to apply a guideline to particular established facts would itself be a decision of fact. To take as an example a guideline not disputed by the parties herein, § 3.808–2 (h) deals with "Subcontracting." It says the "nature and extent of any subcontracting should be considered," and follows with an exposition how to consider it. In case a large amount of the work is subcontracted, consideration must be given to how much "responsibility or risk remains with the prime contractor." Clearly, therefore, a naked refusal by the Board to consider subcontracting, or if it was substantial, to determine how much responsibility or risk remained with the prime contractor, would be an error of law. But if, as the record showed, the Board looked at the subcontracting, its judgment as to how much responsibility or risk remained with the prime contractor would be final and not reviewable. The scope of judicial review is thus narrow and in no case should this or any Article III court put itself in the position of determining what profit is reasonable or making any of the subsidiary evaluations that lead to the ultimate conclusion. The record

should, therefore, clearly show that they were made by the body which should make them, here the Board. It would not seem unreasonable to expect that in a dispute such as this, where litigation might have been expected, the Board should take up the guidelines in their order as published and show in its findings how it made each required evaluation or that it found it irrelevant to the particular case. With this aid, the court could confine its review to the narrow scope which is proper.

Turning now to the case before us, the findings of the Board are silent as to matters when they ought to speak, and when they do speak, they afford disturbing indications that the guidelines were not regarded.

In paragraph 3.808–2(b) *Degree of risk* the guideline states "The degree of risk *assumed* by the contractor should influence the amount of profit or fee a contractor is entitled to *anticipate.*" (Emphasis supplied.) Clearly, therefore, the risk is to be looked at prospectively, not with benefit of hindsight. The Board, however, says " * * since this contract was entered into Appellant's capital has substantially increased and Appellant has maintained its activities * * *." All this means is that the risk did not materialize. On the other hand, the Board fails to evaluate the labor and material escalation and other risk-reducing clauses of the contract, as the guideline says it should. Later on it compares the RANGER contract with that previously undertaken by plaintiff for construction of the FOR-RESTAL, a similar vessel as to hull, and with respect to risk, again predicates its reasoning on hindsight. The Board notes plaintiff's contention that moderate losses on the RANGER contract could have wiped it out, and says (from hindsight) it is not impressed. We should have the Board's reasoned evaluation of the risk, viewed prospectively, with primary emphasis on the risk-reducing clauses of the contract itself.

In paragraph 3.808–2(c) *Nature of Work to be Performed,* the guidelines call for consideration of the "difficulty or complexity of the work to be performed and any unusual demands of the contract * * * whether the class of engineer involved is that of an 'idea man,' or whether the contractor is to be required by the contract to assign to the work unusually skilled talent." This would seem also to call for prospective, not hindsight, consideration, and the Board made no findings that can be related to this factor. We take judicial notice that construction of a Navy aircraft carrier is not something anyone could undertake.

Paragraph 3.808–2(d) deals with *Extent of Governmental Assistance.* It says the Department of Defense encourages its contractors to perform with a "minimum of financial, facilities, or other assistance from the Government." Where circumstances necessitate this kind of crutch, it must modify what is a fair and reasonable profit. The plaintiff here contracted that it needed no Government-furnished facilities and nothing is said about any loans or accelerated amortization. There were the usual progress payments and some Government-furnished material. How, if at all, the Board applied this factor in its deliberations is not disclosed. Apparently, instead of the contractor borrowing money from the Government, it incurred costs in excess of progress payments up to a maximum of $10,000,000, in round figures, at times.

Paragraph 3.808–2(e) deals with *Extent of the Contractor's Investment.* It says the total investment, equity and borrowed capital, in the performance of the contract will be considered. Plaintiff under the risk factor stresses the smallness of its capital in relation to possible losses, under the contract. If the Board found the capital was likewise small in relation to the profit actually earned, this factor might operate adversely to plaintiff; however, we have no Board evaluation or findings.

Paragraph 3.808–2(f) considers *Character of Contractor's Business.* This deals with the somewhat abstruse matter of the type of business, complexity of manufacturing technique, and rate of capital turnover. The rate of capital turnover is the ratio of invested capital to sales. When a large and costly plant is necessarily required to produce a given volume of sales, the ratio of profit to sales should be larger than it should be if a small and cheap plant sufficed for the same volume. Similarly, if the "value added" is relatively high, that is, the completed product has a high value in relation to the value of the materials purchased, the ratio of profit to sales should be greater and in the converse situation, less. There is nothing to show how the Board applied this factor to the case at hand.

Paragraph 3.808–2(g) relates to *Contractor's Performance.* This is the converse of *Nature of Work to be Performed* (paragraph 3.808–2(c)) in that it calls for a retrospective instead of a prospective look at the contract job. It may be otherwise called the "efficiency" factor. It relates to such matters as "quality of product," efficiency in cost control," "meeting delivery schedules," "engineering (including inventive design simplification, and development contributions)." Plaintiff claimed and the defendant conceded that plaintiff earned an emphatic plus on this factor. Nevertheless, the Board made certain statements that raise serious doubts whether it interpreted the guidelines correctly.

First, the Board notes that the vessel was completed on August 8, 1957, although the contract date was October 2 of that year. The Board says "The evidence indicates that the benefits from this saving in time accrued to Appellant as well as the Government." Apparently this is a reason for denying favorable recognition. But manifestly, superior efficiency always benefits the contractor as well as the Government. If it does not justify a larger profit, the incentive for superior performance is destroyed and the overall cost of Government procurement is enlarged. The Board apparently thinks of the efficiency factor as if it were some kind of change order claim.

Second, the Board seems to think that contractor is not entitled to recognition of superior efficiency to the extent its efficiency derived from experience with the prior vessel of the same class, FORRESTAL. But the guidelines says "Where a contractor has consistently achieved excellent results in the foregoing [efficiency factor] areas * * * such performance merits a proportionately greater opportunity for profit * * *." Thus in negotiating before award, plaintiff could have pointed to its performance with other aircraft carriers, if creditable, as a reason for a larger profit—and the standards are the same for an *ex post facto* determination.

Third, the Board says the cost reductions enabled plaintiff to earn a larger profit than it estimated. This may well be true, but is not relevant under the efficiency factor. The guidelines include a separate provision entitled 3.808–2(i) *Unrealistic Estimates,* and if the contractor's actual costs are *consistently* (emphasis supplied) lower than its estimates it would be for the Board to make the appropriate findings and a lower profit would doubtless be in order. If the unrealistic estimates are not consistent, or otherwise not appropriate for handling under subparagraph (j), they are still not relevant under the efficiency factor. The old Renegotiation Regulations of 1943 provided under the "risk" factor for "risk incidental to reasonable pricing policies" (R.R. 413), which is omitted from the guidelines now under consideration. "Close pricing" may nevertheless be for consideration under the "risk" factor, where it would seem more relevant.

Fourth, the Board thinks the plaintiff's conceded engineering "foresight and ingenuity" which "saved money with respect to various inevitable changes" was not shown to be uncompensated for by price increases theretofore accomplished. We think it is possible the

Board has the impression that inventive and developmental contribution is entitled to favorable consideration only if associated with a change order which did not include a profit allowance. We think the Board should consider the contract as amended and supplemented, as a whole, and the engineering and developmental contribution as a whole. The Board, if it did, might well find, as plaintiff urges, contributions not directly related to change orders and/or not readily compensable in change order price increases. At any rate, in determining a reasonable level of profit under the contract, whether the parties visualized the estimated profit as paying or not paying for any particular contribution is irrelevant.

See paragraph 3.808–2(h) *Subcontracting.* This is not discussed further as our discussion of the other factors seems more related to the actual case. Paragraph 3.808–2(i) *Unrealistic Estimates,* has been considered above.

 Since the case must go back to the Board for additional findings we invite its attention to one other matter. The Board may perhaps continue to believe that the profit should not exceed that realized on the sister vessel FORRESTAL which was the "lead ship" of the class as to the hull, and necessarily involved a larger developmental contribution. However, it might also consider whether the fair intent of paragraph 3.808–1 (set forth in the appendix) is that the comparison should be made in dollars, not percentages. Here the profit on the RANGER, before the claimed escalation, is $11,262,084.27. On the FORRESTAL it was $14,316,062.41. There is, therefore, margin for escalating the RANGER's price without exceeding the FORRESTAL's. The Board thought they should make the comparison in ratio of profit to cost which, on the above profits, is 10.43 percent for the FORRESTAL, 9.58 percent for the RANGER. The value of Government-furnished material on the RANGER, according to the Board, exceeded that of the FORRESTAL by $12,855,000, more than half the

cost reduction made on the RANGER. The comparison of percentages of profit to contractor's cost as made in terms of percentages is misleading when the two cases are unlike in their utilization of Government material which does not appear on the contractor's books to enhance the costs. Evidently if some kind of percentage adjustment were contrived for the Government-furnished material, the profit percentages under the two contracts would be further apart. To the extent that the lower cost of the RANGER resulted from improved efficiency, the comparison of profit percentages implies that a contractor who reduces cost through improved efficiency should get a correspondingly lower profit, another absurdity. These considerations illustrate classically the wisdom of the framer of paragraph 3.808–1 in prescribing that when possible profit should be conceived of in dollars, not percentages.

The suggestion that Article 6(e) does not require a determination of the reasonable level of profit we consider somewhat of a quibble. Clearly the contracting officer determined that "the profit already accrued was fair and reasonable." That is what he wrote. Had he determined it was less than fair and reasonable, he would have had to determine by how much it was less. Possibilities of a similar kind inhere in application of profit limitation provisions, as e. g., in Renegotiation, except that then a finding the profit was more than reasonable would be what would trigger the more precise findings. There is nothing in the circumstances of an Article 6(e) determination to excuse following the guidelines of the ASPR that would apply to initial pricing or to redetermination, as carefully as in any other case. Of course, we recognize that it is never possible to fix a single exact line where and only where the profits are reasonable. It is a band, not a line, involving an exercise of judgment which can claim accuracy only within broad limits. If the profit actually accrued is within the band, the action is not called for that would be triggered by excess, in case

of a profit limitation provision, or insufficiency here. The Board should have allowed an escalation under Article 6(e) only if it found a material and substantial difference between the actual profit and what it determined to be reasonable.

While the decision of the Board is cogent and well reasoned, it does not include material it should have if we are to determine that it is based on substantial evidence and incorporates no errors of law. On the assumption that the guidelines laid down in ASPR are law binding on the Board, the Board should show that it has followed them in making the difficult determinations they call for. Presumably it possesses the expertise to do so. We do not, and if we did we would be barred from exercising it by the Wunderlich Act, *supra*, the disputes clause involved herein, and United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Nothing said herein should be construed as intimating any opinion whether all or any part of the involved labor and material escalation should be allowed the plaintiff.

In view of the opinions expressed, further proceedings in the court will be suspended to allow the parties time to apply to the Armed Services Board of Contract Appeals for further findings.

DAVIS, Judge (concurring in part and dissenting in part):

I join in the first part of the court's opinion but not in the discussion (under the heading of "Board Proceeding and Decision") of the errors the court finds in the Board's consideration of the appeal. Commissioner Maletz held that there were no material errors in the Board's evaluation. I agree and would adopt that part of his opinion which the court rejects.

On this facet of the litigation I am sensitive to a number of significant aspects of the case which we cannot neglect:

(i) Article 6(e) of the contract (the escalation clause) entitled the plaintiff to an upward price adjustment only if the gain already made was less than the minimal "fair and reasonable profit". No escalation at all could be allowed unless the existing profit was below the lowest reach of the broad spectrum, band, or range which comprises a "fair and reasonable profit"; it would never be enough for contractor merely to show that the claimed increase would leave it with no more than a fair and reasonable profit. The essential prerequisite is a showing of unfairness.

(ii) Newport News bore the burden of proving to the Board that its existing profit fell below this minimum amount, and the contractor likewise shoulders the burden of convincing the court that the Board erred either in its appraisal of the relevant criteria or in failing to consider them.

(iii) The Board's handling of the case responded to the contractor's presentation to it. As the Commissioner pointed out, plaintiff "directed its presentation and argument before the Board to factors which in its [the plaintiff's] view justified an upward adjustment", and "the Board in its decision discussed each of the factors thus urged by plaintiff and did not rely upon any new or novel factor which was not available for plaintiff's presentation to it." The Board should not be faulted for casting its opinion in terms of the arguments made to it and the factors it was asked to consider. It was not required to speak as to guidelines which the plaintiff did not see fit to bring into the case.

(iv) The Board, as the court recognizes, is the tribunal charged with the function of determining the minimal fair and reasonable profit, and that function necessarily calls for judgment and discretion—not for mathematical formulae, precise rules, or scientific demonstration.

(v) As a reviewing court, our task is to decide whether the Board's *decision* was wrong—either because of the process it followed or because of a substantial error contributing to the decision. We are not called upon to review every sentence it uttered, let alone to agree with

every sentence, standing alone. Only if we are persuaded that it committed a material error of omission or commission—looking at the opinion and decision as a whole, as well as at the nature of the Board's function—should we set aside the administrative determination.

In the light of these considerations, and on the basis of Commissioner Maletz's opinion, I conclude that the contractor has failed to persuade that the Board erred in determining that "the evidence and Appellant's arguments do not convince us that $11,262,084.27 is less than a fair and reasonable profit." Accordingly, I would hold that plaintiff is not entitled to recover and would dismiss its petition.

SKELTON, Judge (concurring in part and dissenting in part):

I join in the concurring and dissenting opinion of Judge Davis for the reasons stated by him.

In addition, the guidelines set forth in the Armed Services Procurement Regulations found in the Code of Federal Regulations (C.F.R.) were as available to the plaintiff as they were to the Armed Services Board of Contract Appeals. The plaintiff had the burden of showing how and wherein it had been determined unfairly that it had made a fair and reasonable profit without the claimed escalation of prices. It was required to do this within the provisions of the contract and regulations. The Board was only required to consider the proof offered by plaintiff and was not compelled to comment on those regulations which were not invoked by the plaintiff's evidence.

We must assume in the absence of evidence to the contrary, that the Board, in the exercise of its discretion, followed the guidelines in the regulations. We should not send the case back to the Board for the purpose of requiring it to spell out specifically and in detail which of the rules it followed and to what extent, especially where there is no showing that it considered evidence dehors the record or other improper evidence.

Also, I think the decision of the Board should be approved for the further reason that insofar as it is for us to judge the plaintiff has failed to show that it made less than a fair and reasonable profit. The facts show that in the beginning it expected to make a profit of 6.67 per cent ($7,363,000) on its costs. When the job was completed it found that it had made a profit of 9.58 per cent on its costs, or a profit of $11,262,-084.27. Most businessmen would be happy to make this kind of profit. Certainly plaintiff has not shown it is less than fair and reasonable. Plaintiff seeks an additional sum of $7,284,236.45 by way of escalation of price which would give it a profit of $18,546,320.72 or 15.77 per cent over its costs. The Board properly concluded on the evidence before it that this increase was not necessary in whole or in part for plaintiff to make a fair and reasonable profit on the contract and there was substantial evidence in the record as a whole to support the Board's decision.

I would hold that plaintiff is not entitled to recover and would dismiss its petition.

DAVIS, Judge, joins in the foregoing opinion of Judge SKELTON.

## APPENDIX A

Excerpt from Armed Services Procurement Regulation, Title 32 (Cum. Supp. as of January 1, 1960)

§ 3.808–1 GENERAL

A fair and reasonable provision for profit or fee cannot be made by simply applying a certain predetermined percentage to the cost estimate or selling price of a product. Rather, the profit or fee should be first established as a dollar amount, after considering the factors set forth in this section. Therefore, where a fee is involved and it is necessary to determine the percentage relationship between the fee and the estimated cost of the contract in order to comply with administrative and statutory

limitations on fees for cost-reimbursement type contracts, the percentage shall be determined only after the dollar amount of the fee has been established for negotiation purposes. [Amdt. 49, 24 F.R. 10631, Dec. 24, 1959]

§ 3.808–2 FACTORS FOR DETERMINING FEE OR PROFIT

The factors set forth in subparagraphs (a) through (i) below should be considered in determining profit or fee in all contracts, whether for supplies or services; for construction work; or for experimental, developmental, or research work; and whether of the fixed-price type or of the cost-reimbursement type unless otherwise specified in the particular factor. All of the following factors, as set forth in paragraphs (a) through (i) of this section should be evaluated in the light of the basic policy set forth in § 3.801–1 which provides that supplies and services shall be procured from responsible sources at fair and reasonable prices calculated to result in the lowest overall cost to the Government:

(a) Effect of Competition. Where competition is adequate and effective and proposals are on a firm fixed-price basis, the contracting officer normally need not consider in detail the amount of estimated profit included in a price. Where effective competition is lacking, the estimate for profit for the proposed fixed fee should be analyzed in the same manner as all other elements of price, applying the factors set forth in this section.

(b) Degree of Risk. (1) The degree of risk assumed by the contractor should influence the amount of profit or fee a contractor is entitled to anticipate. For example, where a portion of the risk has been shifted to the Government through cost-reimbursement or price redetermination provisions, unusual contingency provisions, or other risk-reducing measures, the amount of profit or fee should be less than where the contractor assumes all risk.

(2) Some cost-plus-a-fixed-fee contracts and task orders for research and development call for the delivery of prototypes of other "hardware." Other such contracts or task orders require only that the contractor exert its "best efforts" to deliver the required end item. Frequently this is because the contractor is not willing to assume the additional burden of incurring substantial cost overruns without additional fee in order to complete performance. When the contract calls for delivery of developed models in accordance with well-defined performance or design characteristics or a predetermined delivery schedule, or both, in contrast to an obligation only to exert its "best efforts" to develop and deliver such models, payment of the fee should be conditioned on performance in accordance with the contractor's obligation to deliver, and in such cases the contractor may be entitled to a larger fee both because of the risk inherent in its commitment and because of the successful completion of the work.

(c) Nature of Work to Be Performed. A major consideration in the determination of the amount of profit or fee, particularly in connection with experimental, developmental, or research work, is the difficulty or complexity of the work to be performed and any unusual demands of the contract, such as whether the project involves a new approach unrelated to existing equipment or only refinements on existing equipment, whether the caliber or class of engineer involved is that of an "idea-man," or whether the contractor is to be required by the contract to assign to the work unusually skilled talent.

(d) Extent of Government Assistance. The Department of Defense encourages its contractors to perform their contracts with the minimum of financial, facilities, or other assistance from the Government. Where extraordinary financial, facilities, or other assistance must be furnished to a contractor by the Government, such extraordinary assistance should have a modifying effect in determining what constitutes a fair and reasonable profit or fee. (See also § 3.404–3(d).)

(e) Extent of the Contractor's Investment. The extent of a contractor's total investment (i. e., both equity and borrowed capital) in the performance of the contract will be taken into consideration in determining the amount of the fee or profit.

(f) Character of Contractor's Business. Recognition must be given to the type of business normally carried on by the contractor, the complexity of manufacturing techniques, the rate of capital turnover, and the effect to each individual procurement upon such business. For example, where a contractor is engaged in an industry where the turnover of working capital is low, generally the profit objective on individual contracts is higher than in those industries where the turnover is more rapid.

(g) Contractor's Performance. In addition to the factors set forth in § 3.101, the contractor's past and present performance should be evaluated in such areas as quality of product, quality control, scrap and spoilage, efficiency in cost control (including need for and reasonableness of cost incurred), meeting delivery schedules, timely compliance with contractual provisions, creative ability in product development (giving consideration to commercial potential of product), engineering (including inventive, design simplification, and development contributions), management of subcontract programs, and any unusual services furnished by the contractor. Where a contractor has consistently achieved excellent results in the foregoing areas in comparison with other contractors in similar circumstances, such performance merits a proportionately greater opportunity for profit or fee. Conversely, a poor record in this regard should be reflected in determining what constitutes a fair and reasonable profit or fee.

(h) Subcontracting. In negotiating the profit or fee, the nature and extent of any subcontracting should be considered, particularly as it bears on the contractor's performance, administrative responsibility, financial investment, and degree of risk as outlined above. The degree and nature of subcontract programs vary on a broad spectrum. While it is not possible to define precisely the exact profit or fee treatment to be accorded each situation, the general guidelines which follow will be taken into consideration. The evaluation of a contractor's subcontracting program should not consist merely of applying arbitrary percentages of profit to subcontract prices in negotiating the prime contract price. A relatively large amount of subcontracting need not make for negotiation of a lesser profit or fee—the character and circumstances of the subcontracting and the effect on the prime contractor's costs must be taken into account. Although purchased material and subcontracted work are usually properly included in the base upon which profit is computed, instances may arise in which a significant portion or portions of a contract are subcontracted in such a way that only a minimum amount of responsibility or risk remains with the prime contractor. In such a case, the amount of fee or profit should be less than where the contractor assumes substantial risk. Of primary importance is the degree to which the subcontracting provides a better product and lower costs, with timely delivery, and in which the contractor assumes heavy managerial effort, responsibility and risk. In this connection, consideration should be given to the contractor's past and present effectiveness in offering to qualified small business concerns and to firms in labor surplus areas an opportunity to compete for subcontracts (see for example § 1.707-3) and to the contractor's furnishing assistance to such concerns as they require or as the Government may specifically request. A contractor's effectiveness in furnishing such opportunity or assistance to an unusual or exceptional degree, should be given favorable consideration in determining the amount of fee or profit.

(i) Unrealistic Estimates. If records reveal that a contractor's actual costs are consistently lower than his estimated costs (indicating a practice of excessive

estimates), and if the contractor refuses to provide what seems to be reasonable estimate of costs, a lower profit or fee should be considered. [Amdt. 49, 24 F.R. 10632, Dec. 24, 1959]